UNITED STATES of America,
Plaintiff-Appellee,

v.

Michael S. POLIZZI,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Joseph E. MATRANGA,
Defendant-Appellant.

Nos. 85–5170, 85–5171.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 10, 1986.

Decided Oct. 10, 1986.

Roger W. Haines, Jr., Asst. U.S. Atty., argued, Peter K. Nunez, U.S. Atty., Roger W. Haines, Jr., Asst. U.S. Atty., on the brief, San Diego, Cal., for plaintiff-appellee.

Neal S. Fink, Detroit, Mich., Eugene G. Iredale, San Diego, Cal., for defendants-appellants.

Before HUG and FLETCHER, Circuit Judges, and GEORGE,[*] District Judge.

HUG, Circuit Judge:

Michael S. Polizzi ("Polizzi") and Joseph E. Matranga ("Matranga") appeal their convictions for conspiracy to collect and the collection of extensions of credit by extortionate means under 18 U.S.C. § 894 (1982) and travel in aid of racketeering under 18 U.S.C. § 1952 (1982).[1]

Polizzi and Matranga jointly raise contentions concerning the jury instructions and a contention that a key government witness committed perjury. They also raise separate issues regarding the jury instructions, a quashed subpoena, Jencks Act and *Brady* material, a severance, sufficiency of the evidence, the admissibility of certain evidence, prosecutorial misconduct, and a continuance.

## BACKGROUND

The Government's principal witness was Harry Hall, a longtime "con man" who admittedly made his living by defrauding people, including persons associated with the Mafia. Hall had a long criminal record. Hall testified that he began cooperating with the Government in part because he believed that he was going to be killed. Neither defendant testified.

Hall testified that, in 1977, he began borrowing large sums of money from Matranga or from people referred by Matranga. Hall testified that he never put up collateral for these loans, that the interest was ten percent a month, and that it was understood that he would be physically hurt if he failed to pay. He had known and socialized with Matranga for many years and Matranga had indicated at various times that he knew people in the Mafia. At the time Hall borrowed the money, Hall

---

[*] The Honorable Lloyd D. George, United States District Judge for the District of Nevada, sitting by designation.

1. Two others were also indicted: Joseph D'Agostino pleaded guilty before trial and Giuseppe DiCarlo-Stassi is a fugitive living in Mexico.

had "heard" that he would "get hurt" if he did not repay Matranga.

Hall testified that he and Matranga concocted a false cover story (a "surplus TV deal," whereby Hall would purchase surplus televisions from the Federal Government and resell them at a profit) to enable Matranga to obtain money to lend to Hall. Matranga told this cover story to John Priziola in order to get $100,000 to lend Hall. Matranga later told Hall that Priziola was the number two man in the Detroit Mafia. Matranga was Priziola's son-in-law.

There was substantial evidence from Hall, other witnesses, and FBI tapes that Matranga often threatened Hall's life when he became delinquent in repaying these loans. Hall testified that after one of these threatening demands for money he was very concerned and worried. Another witness testified that Hall looked upset and scared after confronting Matranga. Matranga often bragged of his organized crime connections and Hall testified regarding such underworld persons that if they demand "a piece of the action ... because of their prominence in the Mafia, you usually succumb to them."

In 1981, Matranga told Hall to call Polizzi. Matranga had told Hall in 1975 that Polizzi was the number four man in Detroit organized crime. Polizzi wanted to know when Hall was going to pay his mother-in-law. Polizzi's mother-in-law was Frances Priziola, John Priziola's widow.[2] In 1982, Matranga and Polizzi met with Hall, and Polizzi, after complaining that his mother-in-law had not been receiving any payments, told Hall, "[f]rom now on, the money you are giving [Matranga], I want my mother-in-law to get that money ... enough is enough." In 1983, Polizzi told Hall (who again protested that he had been making payments to Matranga): "my mother-in-law hasn't gotten a dime ... other than what you sent to the bank that time." In May 1983, Polizzi reminded Hall that he still owed "six seventy." Hall testi-

---

**2.** John Priziola died in April 1979. Both Matranga and Polizzi had married daughters of Priziola.

fied that he felt threatened by Polizzi's reputation. Between 1980 and 1983, Hall made various payments to Matranga and to Polizzi.

## ANALYSIS

### I.

### Collection by Extortionate Means Instruction

■ Polizzi and Matranga contend that the trial court erred in instructing the jury that actual fear is not an element of the offense of using extortionate means to collect an extension of credit under 18 U.S.C. § 894. This involves a matter of statutory construction, which we review *de novo*. *United States v. Fields*, 783 F.2d 1382, 1384 (9th Cir.1986); *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

18 U.S.C. § 894(a)(1) provides that "[w]hoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means to collect or attempt to collect any extension of credit" is guilty of a crime punishable by a $10,000 fine or 20 years in prison, or both. "Extortionate means" is defined by 18 U.S.C. § 891(7) (1982) as "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person."

Polizzi and Matranga requested the trial court to instruct that actual fear is an element of this offense. The trial court refused and instead instructed the jury:

If you find, under all the circumstances shown in the evidence, an ordinary person would have been put in fear of immediate bodily or economic harm, or future bodily or economic harm from anything the defendant said or did, then you may find that the defendant did use extortion-

ate means to instill fear within the meaning of these instructions.

The government need not prove that the victim was actually afraid of the defendant, since actual fear is not an element of the offense. Rather, it is the intent to create fear of harm which is prohibited.

It is the threat of violence or harm to the debtor to collect or attempt to collect the extension of credit that is prohibited by section 894; the production of actual fear in the debtor is not an element of the offense. The Second Circuit has so held in a number of cases. *United States v. Sears*, 544 F.2d 585, 587 (2d Cir.1976); *United States v. Natale*, 526 F.2d 1160, 1168–69 (2d Cir.1975), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976). It is the nature of the actions of the person seeking to collect the indebtedness, not the mental state produced in the debtor, that is the focus of the inquiry for the jury. The person to whom threats are made could be a government agent, or not be in actual fear for some other reason, and yet a section 894 violation could occur. However, a more practical reason for Congress having defined the offense in this manner is that a victim may be easily intimidated and thus testimony concerning his actual fear might be difficult to obtain. The legislative history that led to the enactment of the provisions dealing with extortionate credit transactions confirms this. It was noted that the major difficulty in prosecuting crimes of this type is the reluctance of victims to testify. Conf.Rep. No. 1397, 90th Cong., 2d Sess. *reprinted in* 1968 U.S.Code Cong. & Ad.News 1962, 2021, 2026. The instruction, as given, is in accord with this authority.

Polizzi and Matranga contend that a passage in *United States v. Nace*, 561 F.2d 763, 768 (9th Cir.1977), supports their contention. There the issue before the court was the relevance of testimony concerning organized crime. The opinion stated that the evidence was relevant to the issue of the debtor's fear and that "[s]uch fear is an essential element of the crime charged. 18 U.S.C. §§ 894, 891(7); *United States v. Curcio*, 310 F.Supp. 351 (D.Conn.1970)." *Id.* In the context in which this statement was made, it is apparent that all that Nace held was that the debtor's fear was relevant and probative to the section 894 offense. There is no indication that the court was expressing an opinion on the issue before us or attempting to create a conflict with the opinion previously expressed by the Second Circuit in *Natale*. This is evident from the fact that the authority cited by this court in *Nace* was also cited with approval in the Second Circuit's *Natale* opinion. Both opinions cite to the *Curcio* case, with the pertinent language from *Curcio* being cited in *Natale* as follows:

> Acts or statements constitute a threat under 18 U.S.C. § 891(7) "if they instill fear in the person to whom they are directed *or are reasonably calculated to do so in light of the surrounding circumstances.*" *United States v. Curcio*,
> . . . .

*Natale*, 526 F.2d at 1168 (emphasis in *Natale* opinion). Thus, our statement in *Nace* clearly was directed solely at the issue of admissibility of evidence, not at the statutory prerequisites for establishing the offense.[3]

## II.

### Extortionate Extension of Credit Instruction

Matranga contends that the Government relied on an alleged violation of 18 U.S.C. § 892 (1982) to prove violations of section 894, and that therefore the trial court improperly refused to instruct the jury on the elements of section 892, which proscribes the making of extortionate extensions of

---

3. Polizzi and Matranga's reliance on *Carbo v. United States*, 314 F.2d 718 (9th Cir.1963), *cert. denied*, 377 U.S. 953, 1010, 84 S.Ct. 1625, 1902,

12 L.Ed.2d 498, 1058 (1964), is not persuasive. That case involved an interpretation of a provi-

credit.[4] The indictment did not charge a section 892 violation.

■ The district court has broad discretion in formulating jury instructions. *United States v. Steel,* 759 F.2d 706, 710–11 (9th Cir.1985). When reviewing a challenge to jury instructions, this court considers the instructions as a whole, *United States v. Park,* 421 U.S. 658, 674, 95 S.Ct. 1903, 1912, 44 L.Ed.2d 489 (1975); *United States v. Wellington,* 754 F.2d 1457, 1463 (9th Cir.), *cert. denied, sub. nom., Utz v. U.S.,* ── U.S. ──, 106 S.Ct. 592, 88 L.Ed.2d 573 (1985), and reviews them for an abuse of discretion. *Steel,* 759 F.2d at 710–11. The district court must give an instruction regarding any legitimate theory of defense that is supported by the evidence, *Wellington,* 754 F.2d at 1463, and a failure to do so is reversible error, *United States v. Coin,* 753 F.2d 1510, 1511 (9th Cir.1985).

Matranga asked the district court to give an instruction on the elements of a section 892 offense. The court refused to give the requested instruction.

[3] While section 892 proscribes the making of an illegal extension of credit, section 894 proscribes the use of illegal means to collect any extension of credit, regardless of whether that extension of credit was made legally or illegally. The Government argued that the jury could consider evidence that the original extension of credit was extortionate (in that it was known by the parties to be secured by "life and limb") as evidence that extortionate means were used to collect the extension of credit. Matranga contends that because the Government relied on this theory, the district court should have instruct-

ed the jury on the elements of a section 892 violation.

Matranga cites no authority in support of this contention. The fact that threats were made in conjunction with the extension of credit is probative evidence of whether section 894 was violated and should be evaluated in that light. The Government need not prove a violation of section 892 to establish that inference. The victim's awareness of possible violence is itself probative of a section 894 violation. That such evidence may also be probative of a section 892 violation, which was not charged, is irrelevant. Therefore, the trial court properly refused to instruct the jury on the statutory elements of section 892.[5]

## III.

### Alleged Use of Perjured Testimony

Polizzi and Matranga contend that they were denied a fair trial when the prosecutor failed to correct Hall's testimony, which they contend was perjured. They argue that Hall committed perjury when he testified on cross-examination that he had never been a government informant.

■ A conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the outcome of the trial. *See United States v. Bagley,* ── U.S. ──, 105 S.Ct. 3375, 3382, 87 L.Ed.2d 481 (1985). The deliberate deception of a court and jurors through the presentation of known false evidence is incompatible with "rudimentary demands of justice." *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935).

sion of the Hobbs Act, 18 U.S.C. § 1951, which has different statutory elements and definitions.

**4.** 18 U.S.C. § 892 provides that "[w]hoever makes any extortionate extension of credit, or conspires to do so" is guilty of an offense. Section 891(6) defines an "extortionate extension of credit" as one involving an "understanding of the creditor and the debtor ... that delay in making repayment or failure to make repayment could result in the use of violence or other

criminal means to cause harm." 18 U.S.C. § 894 proscribes the use of extortionate means to collect any extension of credit. *See* pages 1547–1548, *supra.*

**5.** Because we conclude that it was unnecessary to give an instruction on the elements of a section 892 violation, we need not address the question of whether the proposed instruction correctly stated those elements.

Hall testified on cross-examination that he had never been an informant. Matranga's defense counsel pressed Hall as to whether he had been an informant for Phil Manuel, John Daley, the IRS, or the FBI, to which he responded that he had never been an informant. After Matranga's defense counsel concluded his cross-examination of Hall, the court held an in-chambers conference with the prosecutor and defense counsel. Defense counsel argued that Hall committed perjury when he denied having been a government informant. Defense counsel stated that he had three newspaper articles describing Hall as an informant off and on for thirty years. He demanded that the prosecutor correct Hall's testimony. The prosecutor explained that he did not think that Hall had perjured himself because he was not "aware that [Hall] has ever been an informant, in the sense that he has been classified as such. He has never testified before this trial, and I don't think counsel really pursued that area enough to know what he meant when he said 'I'm not an informant.'" As a result, the court found that the "record should stand as it is," and noted that defense counsel could still argue Hall's credibility.

At best, Hall's testimony is ambiguous. During the hearing on Matranga's motion for a new trial, Hall further clarified what he meant when he stated that he had not been an informant. Apparently, Hall did not consider himself an "informant," in the sense of being on a steady payroll and testifying against someone. Yet, he freely admitted to having given information to various government officials over the last forty years.

The record is ambiguous, as well. In response to Matranga's post-trial request, the prosecution conducted a search of the Government's files for indications of Hall's status as an informant. The files suggest that Hall may have been classified as an informant or a potential informant for the FBI, the Secret Service, and the IRS. In addition, at the hearing on Matranga's motion for a new trial, several former IRS and FBI employees testified about their relationship with Hall. They described Hall as

a "source of information," but did not consider him an "informant."

Thus, the question of Hall's status as an informant appears to be an unanswerable matter of semantics. The cross-examination did not bring out what was meant by the term "informant"; thus, it is not possible to determine what Hall meant when he testified that he had not been an "informant" and whether, in fact, he perjured himself.

Even assuming that Hall perjured himself, a new trial is unwarranted because, beyond a reasonable doubt, Hall's denial of being an informant did not affect the outcome of the trial. *See Bagley*, 105 S.Ct. at 3382.

■ Although a prosecutor's presentation of tainted evidence is viewed seriously and its effects are exceedingly carefully scrutinized, a new trial is not automatically granted. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Thomas v. Cardwell*, 626 F.2d 1375, 1381 (9th Cir.1980), *cert. denied*, 449 U.S. 1089, 101 S.Ct. 881, 66 L.Ed.2d 816 (1981). A finding of materiality of the evidence is required. *Giglio*, 405 U.S. at 154, 92 S.Ct. at 766. A new trial is in order if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *Id.; see Bagley*, 105 S.Ct. at 3382–84. We do not find any possibility here that the verdict was affected.

Polizzi and Matranga contend that the trial would have differed in six ways had the prosecution corrected Hall's perjured testimony: (1) the jury would have known that Hall had lied on a material matter; (2) the court could have given the "admitted perjurer" jury instruction; (3) the defense could have shown Hall's bias and interest in the Government's case and his motive to fabricate; (4) the defense would have been able to establish Hall's pattern of manipulating government officials and his role as a cooperating informant; (5) the defense would have been able to pursue an entrapment defense by asking Hall if he had been acting as a government agent during his

dealings with Matranga; and (6) the jury would not have inferred that Hall's chief motive for cooperating with the Government was his fear that Matranga would harm him.

The record reveals that Hall was so thoroughly impeached at trial that further impeachment by acknowledgement that he had furnished information to the Government from time to time would have been merely cumulative. Hall was shown to be a longtime "confidence man and swindler." His repeated use of various scams and schemes, such as the surplus government TV scheme, was laid before the jury. His criminal record, including his convictions for fraud and obstruction of justice, was detailed. He repeatedly admitted his willingness to lie. The court provided cautionary false testimony and impeachment jury instructions.

Hall's bias and interest were shown through his cooperation with the Government in this case and his extensive past dealings with the Government. On direct examination, Hall stated that, in exchange for his testimony, he had received a favorable recommendation for early release in his fraud conviction, avoided prosecution for a scheme to defraud the Tropicana Casino in Las Vegas, and received $2,500 for expenses. Hall's bias was fully explored.

Matranga and Polizzi chose not to present an entrapment defense, though fully aware of Hall's contacts with the Government in this case. It is highly doubtful that his admission of being an "informant" on other occasions would have had any bearing on that decision.

Therefore, even if it was error for the Government not to correct Hall's testimony that he was not an "informant," the error would not be grounds for reversal because there is not any reasonable likelihood that the correction would have affected the jury's verdict.

6. 18 U.S.C. § 3500(b) provides that

## IV.

### Quashed Subpoena

Matranga contends that the trial court erred when it quashed a trial subpoena Matranga had served on Phillip Manuel. We review the grant of a motion to quash a subpoena for abuse of discretion. *United States v. Berberian,* 767 F.2d 1324 (9th Cir.1985).

During the trial, Matranga served a subpoena on Phillip Manuel, who was a member of the President's Organized Crime Commission and was formerly a member of the United States Senate Subcommittee on Investigations. Manuel filed an application to quash the subpoena; the district court ordered the subpoena quashed on the grounds that Manuel's testimony would involve only collateral matters and that Manuel may have had a constitutional privilege against testifying.

Matranga argues that Manuel's testimony was relevant because it would have proved that Hall had lied when he denied having been a government informant and it would have revealed that Manuel had played a role in the surplus TV scheme.

Neither argument has merit. Manuel's testimony would have constituted extrinsic evidence attacking Hall's credibility, evidence prohibited by Fed.R.Evid. 608(b). Furthermore, as the district court noted, the evidence showed that, although Hall told others that Manuel was his Washington, D.C. contact for the surplus TV deal, Manuel knew nothing about it. Thus, there was no evidentiary conflict that required Manuel's testimony. Hence, the district court did not abuse its discretion when it ordered the quashing of the Manuel trial subpoena.

## V.

### Jencks Act Material

Matranga contends that the Government failed to comply with the requirements of the Jencks Act, 18 U.S.C. § 3500 (1982),[6] by

After a witness called by the United States has testified on direct examination, the court

not providing him with: (1) the rough notes taken by FBI agent Walker during his interview with Hall; (2) a statement made by Hall during his sentencing in the 1982 wire fraud case; and (3) the sworn affidavit Hall provided in support of his motion for a new trial in the 1982 wire fraud case.

We review a trial court's ruling on Jencks Act issues for an abuse of discretion. *United States v. Miller,* 771 F.2d 1219, 1229 (9th Cir.1985).

■ Matranga concedes that the prosecution gave him an opportunity to review Walker's interview notes during trial. Matranga argues, however, that the Jencks Act required the prosecution to give him copies of these notes, as well. The Jencks Act requires the Government to produce certain statements to which the defendant is entitled. In offering Matranga an opportunity to review Walker's notes, the Government fulfilled its duty to produce this material.

■ The Jencks Act did not require the Government to produce Hall's sentencing statement and affidavit from the 1982 wire fraud case because these statements were not "in the possession of the United States." 18 U.S.C. § 3500(b); *See United States v. Friedman,* 593 F.2d 109, 120 (9th Cir.1979). For Jencks Act purposes, a statement is "in the possession of the United States" when it is in the possession of the prosecutor. *See United States v. Cagnina,* 697 F.2d 915, 922 (11th Cir.), *cert. denied,* 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 157 (1983); *United States v. Hutcher,* 622 F.2d 1083, 1088 (2d Cir.), *cert. denied,* 449 U.S. 875, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980); *United States v. Trevino,* 556 F.2d 1265, 1271 (5th Cir.1977); *cf. United States v. Gatto,* 763 F.2d 1040, 1047–49 (9th Cir.1985) (under Fed.R. Crim.P. 16(a)(1)(C), a statement is in the possession of the Government when in the possession of the prosecutor).

> shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the pos-

Before trial, the prosecutor contacted the Chief of the Los Angeles Strike Force, the agency that prosecuted Hall in 1982, and requested any material from that case reflecting upon Hall's character. The prosecutor then turned over to Matranga everything he received from the Strike Force, which included the indictment, the presentence report, a summary of the Government's case, the sentencing memorandum, and FBI interview reports, but did not include Hall's affidavit and sentencing statement.

Because the prosecutor neither received nor was aware of Hall's affidavit and sentencing statement, they were never in his possession. Moreover, Matranga could have obtained these statements with reasonable diligence from the district court's records. *See Cagnina,* 697 F.2d at 922–23; *Hutcher,* 622 F.2d at 1088; *Trevino,* 556 F.2d at 1271 (statements in the district court's control not in the possession of the prosecution). Thus, the Government had no Jencks Act obligation to produce Hall's affidavit and sentencing statement.

## VI.

### *Brady* Issue

Matranga contends that his conviction must be reversed because the Government violated its duty to disclose Walker's interview notes and Hall's statements from the 1982 wire fraud prosecution, under the authority of *Brady v. Maryland.* Matranga argues that he made a specific request for *Brady* material in his pretrial motion for discovery. He alleges that this information was material to the defense to impeach Hall, and to support his defense that Hall had defrauded him by lying about the surplus government TV investment. These contentions are without merit.

The Government's failure to assist the defense by disclosing information material to guilt or punishment under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10

> session of the United States which relates to the subject matter as to which the witness has testified.

L.Ed.2d 215 (1963), "amounts to a constitutional violation only if it deprives the defendant of a fair trial.... [C]onstitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *United States v. Bagley,* — U.S. —, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985).

 *Brady v. Maryland* requires the prosecution to disclose evidence that is both favorable to the accused and material either to guilt or punishment. 373 U.S. at 87, 83 S.Ct. at 1196; *see Bagley,* 105 S.Ct. at 3379. Impeachment as well as exculpatory evidence falls within *Brady's* definition of evidence favorable to the accused. *Bagley,* 105 S.Ct. at 3380. Such evidence is material, however, "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* at 3384.

## A. Walker's Interview Notes

 Even if the prosecution's failure to disclose Walker's interview notes violated *Brady,* Matranga's conviction need not be reversed because this evidence was not material to the case.

Matranga asserted that he would have used Walker's notes to impeach Hall. Nevertheless, Matranga's conviction does not constitute reversible error because, as impeachment evidence, Walker's interview notes were merely cumulative and thus there was no reasonable probability that it would have affected the result of the trial. As the district court stated in denying Matranga's motion for a new trial: "In this court's twelve years of experience as a trial judge, never has there been a witness so thoroughly and convincingly impeached as Harry Hall.... All told, after three days of cross-examination, there was so little left of this witness' credibility that he could have testified that he was Lucifer himself and the jury would not have further discounted his testimony."

## B. Hall's Statements From the 1982 Fraud Case

 The prosecutor did not withhold Hall's affidavit and sentencing statement in violation of *Brady,* because, as previously discussed, the prosecutor neither was aware of, nor in possession of, Hall's sentencing statement and affidavit from the 1982 wire fraud case. Thus, the prosecutor had no duty to disclose this material. *See Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. at 1196.

## VII.

### Polizzi's Severance Motion

Polizzi contends that the trial court's refusal to grant his motion for a separate trial prejudiced him because: (1) he was prevented from presenting an individual defense; (2) he was prevented from fully impeaching Matranga's credibility; and (3) there was a "spill-over effect" because the evidence against Matranga was far more incriminating and the jury was unable to compartmentalize the evidence.

The denial of a motion for severance under Fed.R.Crim.P. 14 will not be disturbed unless the defendant can show that the district court abused its discretion. *See United States v. Mills,* 597 F.2d 693, 696 (9th Cir.1979). The test for abuse of discretion is "whether a joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion in but one way, by ordering a separate trial." *United States v. Abushi,* 682 F.2d 1289, 1296 (9th Cir.1982); *United States v. Escalante,* 637 F.2d 1197, 1201 (9th Cir.), *cert. denied,* 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980).

 Defendants jointly indicted ordinarily should be jointly tried. *United States v. Sears,* 663 F.2d 896, 900 (9th Cir.1981), *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1731, 72 L.Ed.2d 148 (1982). Serious consideration must be given to judicial economy. *United States v. Kennedy,* 564 F.2d 1329, 1334 (9th Cir.1977), *cert. denied,*

435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978). The burden is on the defendant to show "clear," "manifest," or "undue" prejudice from a joint trial. *Sears,* 663 F.2d at 901; *Escalante,* 637 F.2d at 1201.

Polizzi's argument that he was prevented from presenting an individual defense is without merit. To justify a severance on the ground of antagonistic defenses, there must be a showing of "mutual exclusivity"—Polizzi's acquittal had to preclude Matranga's acquittal. *United States v. Gonzales,* 749 F.2d 1329, 1333–34 (9th Cir.1984); *United States v. Ramirez,* 710 F.2d 535, 546 (9th Cir.1983). Polizzi has made no showing that his acquittal depended on Matranga's conviction.

There was no showing that Polizzi was impeded in any substantial way in impeaching Matranga's credibility by the denial of the severance. Nor did the court abuse its discretion by denying severance because of any "spill-over effect." The mere fact that there may be more incriminating evidence against one codefendant than another does not provide a sufficient justification for separate trials. *United States v. Marcello,* 731 F.2d 1354, 1360 (9th Cir.1984). The court's inquiry as to prejudice focuses on "whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants in light of its volume and limited admissibility." *Ramirez,* 710 F.2d at 546, (quoting *United States v. Brady,* 579 F.2d 1121, 1128 (9th Cir.1978), *cert. denied,* 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979)).

The trial court instructed the jury that it had a responsibility to keep the evidence against the two defendants separate, that it should give "separate, personal consideration ... to each individual defendant" and "analyze what the evidence ... shows with respect to that individual, leaving out of consideration entirely any evidence admitted solely against" the other defendant, and that "[e]ach defendant is entitled to have his case determined from evidence as to his own acts or statements or conduct." The trial court's instructions sufficiently alerted the jury to its obligation to compartmentalize the evidence, and the potential spill-over effect was not so great as to preclude the jury from doing so. *See Ramirez,* 710 F.2d at 546. The district court did not abuse its discretion in denying the motion for severance.

## VIII.

### Sufficiency of the Evidence as to Polizzi

Polizzi contends that the trial court erred in denying his motions for judgment of acquittal because there was insufficient evidence to support the conviction on the counts charged.

Fed.R.Crim.P. 29(a) requires the trial court to grant a motion for judgment of acquittal "if the evidence is insufficient to sustain a conviction." In reviewing the denial of a motion for acquittal, this court assesses *de novo* the sufficiency of the evidence. The denial is proper if, viewing the evidence and the inferences therefrom in the light most favorable to the Government, any rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Buras,* 633 F.2d 1356, 1359 (9th Cir.1980).

Contrary to Polizzi's contentions, there was sufficient evidence to prove that he conspired to use, and did use, threats of harm in order to collect extensions of credit and that he travelled in interstate commerce and used facilities in interstate commerce in doing so.

The jury could reasonably have inferred that Polizzi knew Hall was paying ten percent per month interest on the debt. Matranga told Hall that $100,000 of the money Matranga loaned him had come from John Priziola. There was evidence that in 1977, John Priziola borrowed $100,000 from a bank and loaned this money to Matranga. In May 1983, Polizzi informed Hall that his debt to Mrs. Priziola stood at "six seventy," because "it was seventy [sic] sixty less the ninety that you sent her." The Govern-

ment argued to the jury that this meant Hall owed $760,000 in total, which consisted of sixty-six months' interest of $10,000 per month (ten percent simple interest per month) plus the $100,000 principal.[7]

The jury could reasonably have concluded that this evidence proved that Polizzi knew Hall was paying an extortionate rate of interest on his debt and that Polizzi must therefore have known that the debt could have been secured only by threats of violence or harm to Hall. Moreover, Hall testified that he never put up any collateral for these loans besides his "life and limb." The jury could have reasonably inferred that Polizzi knew there was no collateral, because he first approached Hall through Matranga and later took over from Matranga in collecting the Priziola debt from Hall.

The evidence showed that some of the money Matranga collected from Hall was supposed to go to the Priziolas. When Polizzi first intervened, he complained that this money was not reaching Mrs. Priziola, and he told Hall that, from then on, Hall was to pay Polizzi directly. There was also evidence that Polizzi was aware of Matranga's collection methods. Matranga's violent character was well established at trial and Matranga also told Polizzi that he had protected Hall from a well-known Mafia figure. By redirecting Hall's payments from Matranga to himself, the jury could reasonably have concluded that Polizzi was utilizing both the initial extortionate arrangement and Matranga's violent methods to intimidate Hall into making payments. The jury also could reasonably have concluded that Polizzi, on behalf of the Priziolas, had been using Matranga as a collection agent.

Moreover, there was evidence from which the jury could have concluded that Polizzi also used his Mafia reputation as an implicit threat to pressure Hall into making payments. Hall testified that he felt threatened by Polizzi's "reputation." Ma-

tranga had told Hall that Polizzi was a top person in the Detroit Mafia. The jury could have inferred that Polizzi knew that Hall feared the Mafia and that this was utilized by both Polizzi and Matranga in the attempt to collect an extortionate loan. We have approved the use of reputation evidence as a probative fact to show a defendant's intent to take part in an extortionate scheme. *Carbo v. United States,* 314 F.2d 718, 740–42 (9th Cir.1963), *cert. denied,* 377 U.S. 953, 1010, 84 S.Ct. 1625, 1902, 12 L.Ed.2d 498, 1058 (1964).

The accumulation of the evidence was therefore sufficient to permit the jury reasonably to conclude that Polizzi knew of the loan's extortionate terms and used extortionate means to make collections. Thus, there was sufficient evidence to sustain Polizzi's convictions.

## IX.

### Negative Character Evidence

 Matranga contends that the court erred in admitting "negative character evidence" against him, other than the evidence showing that he had threatened or otherwise created fear in Hall in connection with any extension of credit. As examples of such evidence, Matranga cites the admission of his own claimed Mafia connections, various specific events involving the handling of a gun, a statement that Matranga intended to shoot a third person, and Matranga's intervention on Hall's behalf with known underworld figures.

Trial court decisions to admit evidence are reviewed for an abuse of discretion. *United States v. Winn,* 767 F.2d 527, 529 (9th Cir.1985); *United States v. Solomon,* 753 F.2d 1522, 1524 (9th Cir.1985). The evidence presented at trial regarding Matranga's violent character and his self-proclaimed Mafia connections was relevant to the issue of whether Matranga used extortionate means to collect extensions of credit in violation of section 894, and was prop-

---

**7.** Polizzi contests the accuracy of the $100,000 figure, arguing that Hall testified in several places that he had "heard" that John Priziola may have invested additional monies in the sur-

plus TV deal. Although Hall's testimony is ambiguous, when viewed in the light most favorable to the Government, it supports the $100,000 figure.

erly admissible under the authority of *United States v. Nace*, 561 F.2d 763, 767–68 (9th Cir.1977). The district court did not abuse its discretion in admitting the challenged evidence.

## X.

### Admission of the D'Agostino Tape

 Matranga contends that the trial court erred in admitting into evidence a tape recording of a conversation held by Matranga, D'Agostino (the codefendant who pleaded guilty before trial), and several others. The tape recording at issue contains an exchange in which Matranga talks about killing Hall, and D'Agostino suggests the name of a killer. Matranga contends that the tape should not have been admitted because it was irrelevant, not probative of the charged offenses, and too prejudicial. He argues that this evidence was irrelevant because the conversation was mere drunken bravado, and during eighty-one succeeding days of wiretapping, there is no further discussion of a plan to kill Hall. The Government argues that the conversation was carried out in "cold, calm and sober voices." It was up to the jury to determine the seriousness of this conversation.

Section 894 prohibits the "knowing" use of extortionate means; and, therefore, the defendant's state of mind is an element of the offense. The fact that Hall was not present at the time does not mean that the tape was not probative of Matranga's state of mind. The district court did not abuse its discretion by permitting this tape recording to be introduced into evidence.

## XI.

### Reasonable Person Instruction

 While instructing the jury on the elements of 18 U.S.C. § 894, the trial court stated:

If you find, under all the circumstances shown in the evidence, an ordinary person would have been put in fear of immediate bodily or economic harm, or future bodily or economic harm from anything the defendant said or did, then you may find that the defendant did use extortionate means to instill fear within the meaning of these instructions.

Matranga objected to this language, asking that the instruction read: "an ordinary person, having the knowledge of the circumstances which the alleged victim would have, would be placed in fear." Matranga argues that his formulation is required in order to take into account the long friendship between him and Hall and the likelihood that Hall would not have been frightened by Matranga's words and actions.

As we previously discussed, section 894 does not require proof of actual fear in the victim, but only the defendant's intent to use extortionate means. The instruction directs the jury to consider the question "under all the circumstances shown in the evidence." In addition, the court also gave the following instructions:

"Extortionate means," as defined in the law applicable to this case, includes any means which involves the use or any express or implicit threat of use of violence or other criminal means to cause harm to the person, reputation or property of any person.

Acts or statements constitute a threat under the law if they instill fear to the person to whom they are directed, *or are reasonably calculated to do so, in the light of surrounding circumstances.*

(Emphasis added.)

The instructions, as given, adequately informed the jury that it must consider the alleged victim's particular circumstances in determining whether extortionate means were used.

## XII.

### Extension-Of-Credit Instruction

 Matranga contends that the trial court erred in instructing the jury that an "extension of credit," a requisite for finding a violation of 18 U.S.C. § 894, includes any agreement deferring the satisfaction of any debt or claim, "even a debt created

when the debtor defrauds or swindles the creditor." Matranga contends that he was prejudiced by this instruction because Hall's debt arose, not because Matranga loaned him money, but because Hall swindled Matranga on the surplus TV deal. Matranga requested the following additional instruction, based on *United States v. Boulahanis*, 677 F.2d 586, 590 (7th Cir.), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982):

> The extension of credit is a deliberate act by a creditor. It does not occur merely because a customer defaults. Section 894 does not make it a crime to use extortion to collect debt but only to exact repayment of credit previously extended. There must be proof of an agreement to defer payment of a debt.

Matranga's argument is without merit. Section 891(1) defines an extension of credit as "any agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred." The district court so instructed the jury. We have previously held that gambling debts, *United States v. Andrino*, 501 F.2d 1373, 1377 (9th Cir.1974), and even investments in drug smuggling operations, *United States v. Bonanno*, 467 F.2d 14, 16–17 (9th Cir.1972), *cert. denied*, 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1973), constitute debts or claims, however arising. Thus, whether the Matranga-Hall transaction involved a simple loan, an investment in an illegal scheme, or outright embezzlement, there was an extension of credit as long as there was at least a tacit agreement to defer repayment. The district court's instruction required the jury to find such an agreement and was therefore not erroneous.

Matranga's reliance on the language of *Boulahanis* for the proper wording of an "extension of credit" instruction is misplaced. In *Boulahanis*, the Seventh Circuit reversed the defendants' section 894 convictions because it held that there had been no extension of credit. *Boulahanis*,

677 F.2d at 590–91. The *Boulahanis* defendants attempted to extort protection payments from a nightclub owner; there was no underlying debt or claim involved, only a simple demand for money, backed up by violence and threats. *Id.* at 587. Because there was no underlying transaction in which money changed hands, there was nothing to defer and, therefore, there could be no extension of credit. *United States v. McMahan*, 744 F.2d 647, 650 (8th Cir.1984).

By contrast, in *Bonanno*, we found an extension of credit where the victim was told that $2,500 of his $5,000 debt, which arose when a drug smuggling scheme went awry, had to be repaid immediately and the victim "made repeated assurances ... that the balance would be paid." *Bonanno*, 467 F.2d at 15. In *Andrino*, we found extensions of credit where victims lost to the defendant at cards, refused to pay their losses the next day, and then suffered violence and threats. *Andrino*, 501 F.2d at 1375–77. In these cases, there were underlying debts or claims that could be made the subject of tacit agreements deferring repayment.

The district court's instruction gave the jury an adequate definition of an "extension of credit," a definition that would have enabled the jury to find extensions of credit in the *Bonanno* and *Andrino* situations, and to find no extension of credit in the *Boulahanis* situation.

## XIII.

### Prosecutorial Misconduct

Matranga contends that the prosecutor made several statements during closing argument that were improper and constituted prejudicial misconduct. Those statements were that: (1) Hall was not smart to have borrowed money from the Mafia; (2) Matranga is a violent man; (3) the defendants used "the tentacles of organized crime"; (4) the jury should "finish the job that the F.B.I. started"; and (5) Hall "had the guts to come in here and testify against someone who had threatened to kill him, and he

did that with Teddy Matranga in the courtroom."

We consider first whether the statements were improper and, if so, whether it is more probable than not that the prosecutor's conduct "materially affected the fairness of the trial." *United States v. McKoy*, 771 F.2d 1207, 1212 (9th Cir.1985).

The Government argues that because timely objections were not made, we must review the prosecutor's conduct under the plain error standard. Because we find that the statements constitute harmless error, we need not address that contention.

 Matranga objected to the "violent man" statement, and the district court overruled the objection, saying that counsel were free to argue reasonable inferences from the evidence. Because the trial record is replete with evidence that raises a reasonable inference that Matranga is violent, this statement was justified by the evidence.

 Matranga also objected to the reference to Teddy Matranga and the innuendo that this relative of the defendant posed a threat to Hall for testifying. It was improper for the prosecutor to suggest that Matranga was associated with threatening witnesses, if there was no evidence of this at trial. *See United States v. Modica*, 663 F.2d 1173, 1179–80 (2d Cir.1981), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982); *United States v. Rios*, 611 F.2d 1335, 1342–43 (10th Cir. 1979). Here, the trial court sustained Matranga's objection and instructed the jury to disregard the statement. The court's curative instruction was adequate to render the prosecutor's misconduct harmless. *See United States v. Berry*, 627 F.2d 193, 200 (9th Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 843 (1981) (court of appeals will not assume that the jury ignored curative instructions).

 Matranga cites *Hance v. Zant*, 696 F.2d 940 (11th Cir.), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983), in support of his contention that the

prosecutor committed prejudicial misconduct when he said:

> I ask you to finish the job that the F.B.I. started when they arrested and convicted Harry Hall, because you have got to go after the people who were the cause of that, and that's Mr. Matranga and Mr. Polizzi.

*Hance* held that a prosecutor's exhortation to the jury to join in the war against crime constituted prejudicial misconduct, but there, the prosecutor went on at length in this vein. *Hance*, 696 F.2d at 952. Here, the prosecutor made only this single statement. Although improper (for telling the jury it had any obligation other than weighing the evidence), whatever prejudice flowed from this statement was adequately cured when the court later instructed the jury that its function was "to determine the guilt or innocence of the accused from the evidence in this case" and that the "statements and argument of counsel are not evidence." The trial court's instructions were sufficient to focus the jury's attention on the proper issues.

 A more difficult problem is presented by the remaining contested statements, which Matranga argues were prejudicial because they referred to the defendants' organized crime links as established facts, when such evidence had been admitted only to prove Hall's state of mind. Matranga objects to the following statements:

> I'm not saying that Harry Hall is particularly smart to borrow from the Mafia. . . .
>
> And, in a sense, Ladies and Gentlemen, the two men that are seated behind me are the root cause of the problems that Schorin and Reiter and Marco Guido and all the people that Harry Hall victimized, because they used their reputation. They used the tentacles of organized crime. They used the name Jimmy Frattiano and Frank Bompensiero to bully, to threaten, to intimidate, to create fear, to put pressure on Harry Hall to come up with money. He did it the only way he knew how, which was to resort to crime.

These two statements show the prosecutor referring to the Mafia evidence as though it had been established that the defendants had organized crime connections. But the prosecutor also referred more correctly to the actual nature of this evidence: "Matranga likes to brag about his organized crime connections ... [in order to] intimidate people, to make people think that he's a big man with big connections"; Hall "believed ... that Joe Matranga was connected to organized crime"; Polizzi's "presence ... was enough to put fear into the ordinary person's heart" because he was Priziola's son-in-law.

Although the prosecutor's statements were somewhat ambiguous, the court's instruction to the jury made clear that the testimony about the Mafia was for the sole purpose of showing Harry Hall's state of mind.

The court instructed:

Also, during the trial, the government produced testimony regarding Harry Hall's beliefs concerning the reputation and alleged Mafia connections of the defendants. This testimony was permitted only insofar as it may bear on the issue of Hall's state of mind.... You are to consider it only for such limited purpose and for no other purpose and reason.

Set in this context, we find any impropriety in the prosecutor's statement harmless beyond a reasonable doubt.

## XIV.

### Continuance

■ Matranga contends that the trial court erred in denying his motion for a continuance made on the day of trial. It is the responsibility of the moving party to demonstrate the need for a continuance. *United States v. Tamura*, 694 F.2d 591, 600 (9th Cir.1982). A motion for a continuance is addressed to the trial court's discretion, and if the defendant fails to make a

specific showing of prejudice from the denial of a continuance, this court will not find that the denial was an abuse of discretion. *Id.*

■ Matranga's attorney, Sankary, asked the district court for a continuance on the day before trial on the ground that he had to withdraw from the case because he might have to testify. The court denied this motion.[8] On the day of trial, Iredale was substituted in place of Sankary as Matranga's trial attorney. Iredale told the court that he had been working with Sankary for about four weeks preparing the case for trial, that he had reviewed all the discovery in the case, and that he was prepared to try the case immediately. Iredale then offered a motion for continuance, prepared by Sankary, "because of the need to pursue additional discovery." The court denied the motion.

Matranga has not demonstrated that he was prejudiced by the denial of his motion. Although Sankary stated in his motion papers that, "[d]ue to the nature of the discovery, no other counsel or associate can adequately prepare to try the case," Iredale told the trial court that he was fully prepared to begin trying the case that very day. Indeed, Iredale's comments suggested that the need for a continuance was not very serious:

We do have a motion for continuance of the trial on the basis that we desire to have further investigation, but my entry into the case will not be urged as a ground for continuance. As far as I am concerned, I am prepared to try the case. If the court denies the motion for continuance because we feel we need additional time to do independent investigation, I am prepared to proceed today.

Iredale's readiness for trial undercuts Matranga's contention that he was prejudiced by the denial of his motion.[9] There was no

---

8. The district court treated Sankary's oral statement as a motion to withdraw. Both the Government and Polizzi argued that Sankary was merely trying to delay the trial and the district court apparently agreed.

9. This conclusion is supported by the fact that when Sankary originally asked for a continuance, it was solely upon the ground that he needed to withdraw from the case—Sankary said nothing about needing additional time for

abuse of discretion in denying the motion for a continuance.

### CONCLUSION

We find no ground for reversal in any of appellants' contentions. The judgment is AFFIRMED.

investigation. It was not until the following day that anything was said about needing a continuance for investigative purposes. The district court could reasonably have concluded that Matranga was simply casting about for ways to delay the trial.