STATE of Wisconsin, Plaintiff-Respondent,

v.

Reginald GREEN, Defendant-Appellant,†

Joseph Sylvester WILLIAMS, Defendant.

Court of Appeals

*No. 96–0652–CR. Submitted on briefs November 5, 1996.—Decided January 21, 1997.*

(Also reported in 560 N.W.2d 295.)

†Petition to review denied.

For the defendant-appellant the cause was submitted on the briefs of *Mark Lukoff*, assistant state public defender, and *Kenneth P. Casey*, assistant state public defender.

For the plaintiff-respondent the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *Stephen W. Kleinmaier*, assistant attorney general.

Before Fine, Schudson and Curley, JJ.

CURLEY, J.   Reginald Green appeals from a judgment of conviction and from an order denying postconviction relief. A jury convicted Green and a co-defendant of robbery and loan sharking, both as party to a crime. This appeal concerns only the loan sharking conviction. *See* § 943.28, STATS. (1993-94).[1] Green contends that the definition of "extortionate extension

---

[1] Section 943.28, STATS. (1993-94), provides:

**Loan sharking prohibited. (1)** For the purposes of this section:

293

of credit" found in § 943.28(1)(b) of the loan sharking statute requires that the parties agree at the time the credit is extended that failure to repay or any delay in payment may result in the use of violence. He argues that no such evidence was produced at his trial. Green also contends that his constitutional right to a unanimous jury verdict was violated because the verdict and the jury instructions did not specify that the jurors must be unanimous on both the victim of the alleged extortions and the date they took place.

We conclude that the phrase "at the time it is made" found in the § 943.28(1)(b), STATS., definition of "extortionate extension of credit" encompasses credit extensions and renewals as well as the initial loan transaction between the parties. Accordingly, because there was sufficient evidence presented to convict

(a) To collect an extension of credit means to induce in any way any person to make repayment thereof.

(b) An extortionate extension of credit is any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that any delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation or property of any person.

(c) An extortionate means is any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation or property of any person.

(2) Whoever makes any extortionate extension of credit, or conspires to do so, if one or more of the parties to the conspiracy does an act to effect its object, is guilty of a Class C felony.

(3) Whoever advances money or property, whether as a gift, as a loan, as an investment, pursuant to a partnership or profit-sharing arrangement, or otherwise, for the purpose of making extortionate extensions of credit, is guilty of a Class C felony.

(4) Whoever knowingly participates in any way in the use of any extortionate means a) to collect or attempt to collect any extension of credit, or b) to punish any person for the nonrepayment thereof, is guilty of a Class C felony.

Green under this definition, we affirm. He failed, however, to object to the jury instructions at trial and therefore, this issue is waived.

## I. BACKGROUND.

Reginald Green and his co-defendant, Joseph Williams, were charged in one complaint with one count of the armed robbery of Faheem Hamdani, and one count of loan sharking, both as party to the crime. Each was also charged in another case with the strong armed robbery of William Gales, again, as party to the crime. The cases were consolidated for trial purposes. The police were initially contacted by Hamdani, the robbery victim, and the victim of the loan sharking, Danielle Malliet. The evidence that developed at trial revealed that Malliet had been buying cocaine on credit from Green and Williams for several years. Originally she was only charged for the value of the drugs, but this arrangement changed in about June 1994 when the defendants started charging her more than the value of the drugs. William Gales began living with Malliet in 1993 and she introduced him to Green and Williams. Subsequently, Gales also began purchasing drugs from them. In April or May of 1994 the defendants physically assaulted Gales because they claimed he owed them money from his drug purchases that he had failed to repay to the defendants' satisfaction. Malliet was aware of this attack.

In June 1994, after years of purchasing drugs on credit from the defendants, Malliet told the defendants she no longer wanted to buy any drugs from them, nor pay them any more money. She testified at trial that in response to her assertions the defendants threatened her with physical harm, claiming she still owed them significant amounts of money from her earlier drug

purchases. Shortly thereafter they began accompanying her to cash her welfare checks, taking most of the money, claiming she owed them inflated amounts from her previous drug purchases. During this several month period, Malliet was frequently threatened by the defendants over the phone and in person.

In October 1994 the defendants requested that Malliet knock on the door of her friend, Hamdani. She observed the defendants enter his apartment with Williams carrying a gun. Hamdani testified that the defendants were upset with him because he tried to persuade Malliet not to give her entire welfare check to them. He was also told by the defendants that any money not paid by Malliet would become his obligation.

Malliet finally went to the police on October 28, 1994. At this time she was fitted with an electronic listening device and instructed to go through her normal procedure with the defendants when she picked up her check. She complied and was picked up by defendant Williams and taken to a check cashing business. After cashing her check she gave Williams all her money, except for a small check-cashing fee and money for a bus pass. Police arrested Williams after leaving the check cashing business and he gave a statement incriminating himself. He told the police that he sold drugs on credit to Malliet and that if the payment from Malliet was late, the money she owed would be doubled.

Green moved the trial court to vacate the judgment and grant him a new trial based on the same issues he raises now on appeal. The trial court denied the motion.

## II. ANALYSIS.

Green was charged with and convicted of making an extortionate extension of credit in violation of § 943.28(2), STATS., which provides:

> **(2)** Whoever makes any extortionate extension of credit, or conspires to do so, if one or more of the parties to the conspiracy does an act to effect its object, is guilty of a Class C felony.

Section 943.28(1)(b) defines "extortionate extension of credit" as:

> [A]ny extension of credit with respect to which *it is the understanding of the creditor and the debtor at the time it is made* that any delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation or property of any person.

(Emphasis added.)

Green contends that this definition of "extortionate extension of credit" permits a conviction only if there is evidence proving that *at the time* the debt is created the parties had the mutual understanding that a delay in payment could result in the use of violence or other criminal means to cause harm to the person, reputation or property of any person. Stated differently, Green argues that if the parties came to the belief that a failure to pay might result in the use of violence *after* the credit was originally extended, this would not satisfy the statute's definition of "extortionate extension of credit" and therefore would be insufficient to support the verdict.

■

This is an issue of first impression in Wisconsin requiring this court to construe § 943.28, STATS. Accordingly, our review is *de novo*. *See State v. Sostre*, 198 Wis. 2d 409, 414, 542 N.W.2d 774, 776 (1996). Whether sufficient evidence supports the verdict, however, is reviewed under a different standard. "[T]he jury verdict will be overturned only if, viewing the evidence most favorably to the state and conviction, it is inherently or patently incredible, or so lacking in probative value, that no jury could have found guilt beyond a reasonable doubt." *State v. Lossman*, 118 Wis. 2d 526, 543, 348 N.W.2d 159, 168 (1984).

Green urges a reading of the words "extend credit" to include only the initial loan and not subsequent renewals or extensions. Under Green's view, the statute obligates the State to prove that the debtor was threatened by the creditor with violence or other criminal means at the time of the first loan and any threats that came later when the loan was renewed or credit again extended would not violate the statute. Accordingly, under Green's interpretation, because the money sought from Malliet in the October transactions was all for drug purchases made prior to June 1994, there was insufficient evidence to support his conviction. Green reads the statute too narrowly.

■

There are no reported Wisconsin cases interpreting § 943.28(1)(b), STATS., but there are various federal cases interpreting 18 U.S.C. § 891 (1996), the federal "loan sharking" statute.[2] Green

---

[2] 18 U.S.C. § 891 (1996), provides:

For the purposes of this chapter:
   (1)   To extend credit means to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment

argues that it is inappropriate to look to federal law on this question because Wisconsin's loan sharking statute, § 943.28, does not define "[t]o extend credit," while the federal law does contain such a definition.

or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred.

(2) The term "creditor," with reference to any given extension of credit, refers to any person making that extension of credit, or to any person claiming by, under, or through any person making that extension of credit.

(3) The term "debtor," with reference to any given extension of credit, refers to any person to whom that extension of credit is made, or to any person who guarantees the repayment of that extension of credit, or in any manner undertakes to indemnify the creditor against loss resulting from the failure of any person to whom that extension of credit is made to repay the same.

(4) The repayment of any extension of credit includes the repayment, satisfaction, or discharge in whole or in part of any debt or claim, acknowledged or disputed, valid or invalid, resulting from or in connection with that extension of credit.

(5) To collect an extension of credit means to induce in any way any person to make repayment thereof.

(6) An extortionate extension of credit is any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person.

(7) An extortionate means is any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person.

(8) The term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and territories and possessions of the United States.

(9) State law, including conflict of laws rules, governing the enforceability through civil judicial processes of repayment of ny extension of credit or the performance of any promise given in consideration thereof shall be judicially noticed. This paragraph does not impair any authority which any court would otherwise have to take judicial notice of any matter of State law.

The legislative history of § 943.28, however, reflects that the statute was "intended to bring the Wisconsin law somewhat in line with the federal law, both in terms of the prohibited conduct and in terms of penalty." Memorandum Analysis of Assembly Bill 859 from Robert W. Warren, Wisconsin Attorney General (undated 1969) (located in Legislative Reference Bureau Drafting Records for 1969 A.B. 859). Given this legislative intent, "It is well established that federal cases may provide persuasive guidance to the proper application of state law copied from federal law." *State v. Gudenschwager*, 191 Wis. 2d 431, 439, 529 N.W.2d 225, 228 (1995).

We first note that the federal definition of "extortionate extension of credit" is identical to that in § 943.28(1)(b), STATS. *See* 18 U.S.C. § 891(6) (1996). Section 943.28, however, does not contain all the definitions found in its federal counterpart, including a definition of "[t]o extend credit." Under 18 U.S.C. § 891, "[t]o extend credit" means "to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred."

■

Thus, under the federal definition, renewals and extensions of a debt would be covered by the statute. Federal cases interpreting 18 U.S.C. § 891 support this conclusion. *See, e.g., United States v. Polizzi*, 801 F.2d 1543, 1556-57 (9th Cir. 1986) (concluding that the definition of "extension of credit" includes "any agreement deferring the satisfaction of any debt or claim"). We are persuaded that the definition of extending credit under the federal law should also

guide' Wisconsin courts in cases arising out of § 943.28(1)(b), STATS.

■

In doing so, we reject Green's argument that the definition of an extortionate extension of credit is time-sensitive and, therefore, that a conviction can only be obtained if the threat is made at the time of the original extension of credit. His argument is contrary to common sense. The evil being addressed by the statute—the lending of money outside the normal channels and rules, enforced by threats of physical harm and by actual violence—is as great at the time of a later extension of credit as it is at the time of the initial transaction. To embrace Green's argument would leave a hapless and threatened victim unprotected whenever the original debt was extended or renewed.

Green also contends that a limited interpretation of the definition of "extend credit" is supported by language found in the Wisconsin Marital Property Act, § 766.56(3)(a), STATS.,[3] and in the chapter regulating consumer credit transactions, specifically § 422.502(3), STATS.[4] We note that the definition in § 422.501(3),

---

[3] Section 766.56(3)(a), STATS., provides:

(3)(a) In this subsection, "extends credit" means that an open-end credit plan, as defined under s. 421.301(27), is established after the determination date, or that credit other than open-end credit is extended after the determination date. The term does not include renewals, extensions, modifications or the use of an open-end credit plan. This subsection does not apply to an open-end credit plan described under s. 766.555(2) or (3).

[4] Actually, Green has cited the wrong statute. The wording he refers to is found in § 422.501(3), STATS.:

(3) "Extension of credit" means the right to defer payment of debt or to incur debt and defer its payment, that is offered or granted for

STATS., dealing with consumer credit transactions actually supports the federal definition, although this statute is worded differently. The definition, tucked in a subchapter dealing with credit services organizations, provides: "Extension of credit means the right to defer payment of debt or to incur debt and defer its payment that is offered or granted for debt that is incurred primarily for personal family household or agricultural purposes." Further, the phrase "right to defer payment of debt" assumes that a debt has already occurred. It is synonymous with renewing or extending debt. Green also relies on the definition of "extends credit" found in § 766.56(3)(a), STATS., of the Wisconsin Marital Property Act. This particular definition attempts to limit the exposure a spouse may have for debts of the other spouse. Its purpose and intent are quite different from those of the loan sharking statute.

██

Given our reading of § 943.28, it is clear that sufficient evidence supports the jury verdict. *See Lossman*, 118 Wis. 2d at 543, 348 N.W.2d at 168. The record in this case reveals ample evidence to support a conclusion that in October 1994, Malliet had been repeatedly threatened with harm if she did not comply with the wishes of the defendants regarding the repayment of her drug debt. She knew, through the experiences of William Gales and Faheem Hamdani, the consequences for failing to pay for the drugs she bought on credit. She heard the beating administered by Green and the co-defendant to William Gales and she saw the results. She was told Gales was being beaten because he owed them money. She witnessed Green and his co-defendant enter the residence of her

---

debt that is incurred primarily for personal, family, household or agricultural purposes.

neighbor, Faheem Hamdani. She observed the co-defendant brandishing a gun. She knew that Green had taken money and a money order from Hamdani in retaliation for his urging her not to give Green all her money. She had received numerous phone calls and personal visits from the defendants seeking "crazy interest" payments from her. Thus, the record supports the jury's determination that all of the elements of the crime were proved at trial, including the fact that the creditor and the debtor had an understanding at the time credit was extended and that failure to make repayment could result in the use of violence.

With regard to Green's second argument, he asserts that he was denied his state constitutional right to a unanimous jury verdict because the instruction and verdict submitted to the jury did not mention Malliet by name.[5] However, Green concedes that he failed to object to either the verdict or the instructions submitted to the jury. Additionally, he acknowledges that he never requested any special jury instructions on the issue of jury unanimity. Despite this omission, he argues that he is entitled to relief because the right to a unanimous verdict is so fundamental that it cannot be waived.

Green posits that we must reverse if a jury is never instructed that it must unanimously determine both who the victim was and when the offense occurred. The State counters by claiming that there is both statutory authority and established case law requiring a party aggrieved by the verdict and instructions to object timely or face waiver of the issue. The State is correct.

---

[5] We do note that the assistant district attorney repeatedly stated in her closing argument that Malliet was the person victimized by the loan sharking scheme, presumably leaving little doubt in the minds of the jury as to the victim.

Both the case law and § 805.13(3), STATS., hamper one who has failed to object at the time of trial from raising an argument concerning the deficiency of the verdict or instructions.[6] *See State v. Schumacher*, 144 Wis. 2d 388, 402, 424 N.W.2d 672, 677 (1988) (stating that failure to object to proposed instruction is equal to waiver). Although this court has discretionary reversal authority under § 752.35, STATS.,[7] that permits this court to review the unobjected to instruction and verdict, we decline to do so as it does not appear that justice has miscarried or that the real controversy was

---

[6] Section 805.13(3), STATS., provides:

**(3)** INSTRUCTION AND VERDICT CONFERENCE. At the close of the evidence and before arguments to the jury, the court shall conduct a conference with counsel outside the presence of the jury. At the conference, or at such earlier time as the court reasonably directs, counsel may file written motions that the court instruct the jury on the law, and submit verdict questions, as set forth in the motions. The court shall inform counsel on the record of its proposed action on the motions and of the instructions and verdict it proposes to submit. Counsel may object to the proposed instructions or verdict on the grounds of incompleteness or other error, stating the grounds for objection with particularity on the record. *Failure to object at the conference constitutes a waiver of any error in the proposed instructions or verdict.*

(Emphasis added.)

[7] Section 752.35, STATS., provides:

**Discretionary reversal.** In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record and may direct the entry of the proper judgment or remit the case to the trial court for entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

not fully tried. *Vollmer v. Luety*, 156 Wis. 2d 1, 456 N.W.2d 797 (1990).

Thus, given the dictates of *Schumacher*, Green has waived his right to appeal this issue because he did not object to it at trial. Accordingly, we need not address it. Further, many of the cases cited by Green can be distinguished from the facts of this case. For the aforementioned reasons, the judgment of conviction and the order denying postconviction relief are affirmed.

*By the Court.*—Judgment and order affirmed.