**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Malcolm Lee WASHINGTON,
Defendant-Appellant.**

No. 85–1143.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 11, 1987.

Decided June 5, 1987.

Daniel F. Cook, San Jose, Cal., for defendant-appellant.

Sanford Svetcov, San Francisco, Cal., for plaintiff-appellee.

Before POOLE and BOOCHEVER, Circuit Judges, and DIMMICK, District Judge.[*]

---

[*] Honorable Carolyn R. Dimmick, United States District Judge for the Western District of Washington, sitting by designation.

POOLE, Circuit Judge:

Appellant Malcolm Washington ("Washington") appeals his conviction of first degree murder in violation of 18 U.S.C. § 1111, and of assault with a deadly weapon in violation of 18 U.S.C. § 113(c). Washington seeks a new trial, alleging that the trial court erred by: 1) refusing to allow or to himself put questions to prospective jurors at voir dire about whether any were acquainted with any of the government's witnesses; 2) refusing to instruct on diminished capacity and voluntary intoxication defenses; 3) giving erroneous instructions to the jury that use of a deadly weapon is evidence of malice aforethought; 4) giving an erroneous general intent instruction to the jury for the specific intent crime of assault; and 5) failing to comply with the requirements of Fed.R.Crim.P. 32(c)(3)(D) at sentencing. We reverse both convictions and remand for a new trial.

## FACTS

On March 12, 1985, a jury found Washington guilty of the first degree murder of Maggie Armstrong and the assault of Major Joel M. Owens.

Washington and Armstrong lived together briefly in late August and September of 1984 in the home of Diane Bismallah, along with Armstrong's son. Bismallah asked Washington to move out the latter part of September. On September 27, 1984, Washington purchased .38 caliber ammunition. On September 30, 1984, he moved to a nearby motel. Subsequently, Washington was heard to make angry and threatening statements to Armstrong.

An entry on Washington's calendar on October 3, 1984 showed "E.T.S.," meaning "end of tour of service" and the statement, "What does one say about Malcolm Lee Washington? Was he bad, misused, victimized or just crazy? Or could it have been —?" along with his birthdate.

The government and Washington disagree as to the weight of any evidence of fear exhibited by Armstrong prior to the shooting. She did not sleep at Bismallah's Sunday and did not go to work Monday. Armstrong had made plans to move back to Chicago on October 5. In the meantime, however, she had permitted her son to stay at motels with Washington.

At approximately 7 a.m. on October 3, 1984, Washington arrived at the Fort Ord I.D. Card Office where Armstrong worked. Washington was seen pacing around the office and appeared disheveled. Armstrong arrived about 7:15 a.m. As it developed, the telephone wires to her office had been cut. There was no conclusive proof that a knife owned by Washington had made the cuts, although the cuts were "consistent" with cuts made by his knife.

Washington and Armstrong were seen walking together near her office between 7:15 and 7:30 a.m. They had moved about 900 feet when Washington pulled out a gun and shot Armstrong. She fell after the first shot, and Washington fired four more bullets into her body. Death was instantaneous. Washington then fled with his gun and was pursued for several short blocks by Major Owens in his car. When Owens attempted to block his escape, Washington stepped in front of the car and shot Owens through the windshield, wounding him in the arm.

A crowd of approximately 75 to 100 people had gathered and began to pursue Washington. He ran to the Personnel Control Office and surrendered to Major Jack Day, turning over his gun. Day smelled alcohol on Washington. Witnesses testified that Washington had no trouble walking. Four beer cans were found in Washington's car.

## DISCUSSION

### 1) VOIR DIRE

■ In the jury selection process, the court conducted the entire examination. Over objection, the court refused to ask whether jurors knew any of the government's witnesses. We review the sufficiency of voir dire questions for abuse of discretion. *United States v. Feldman*, 788 F.2d 544, 556 (9th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987).

■ "[T]he trial judge [may] insist upon conducting a voir dire examination, but if he does so, he must exercise a sound judicial discretion in the acceptance or rejection of supplemental questions proposed by counsel. Discretion is not properly exercised if the questions are not reasonably sufficient to test the jury for bias or partiality." *United States v. Baldwin*, 607 F.2d 1295, 1297 (9th Cir.1979). In *Baldwin*, this court found reversible error where the trial court refused to ask prospective jurors two questions: 1) whether they would be biased in favor of testimony of law enforcement officers, and 2) whether they were acquainted with any of the government's witnesses. The procedure at voir dire, the court reasoned, did not "create any reasonable assurances that prejudice would be discovered if present." *Id.* at 1298.

■ The *Baldwin* court's ruling was based on the cumulative effect of the trial court's refusal to ask both questions. The court found that as a result of these refusals, the number of meaningful peremptory challenges or challenges for cause were necessarily reduced, and that this inhibition of the right to challenge was prejudicial to the defendant. In reaching its conclusion, the court relied on *Cook v. United States*, 379 F.2d 966 (5th Cir.1967), which held that a refusal to question prospective jurors regarding their acquaintance with a government witness was reversible error. We have also said that "[t]he defendant ha[s] a right to have the question [as to prospective jurors' acquaintance with witnesses] answered to afford him an opportunity to exercise his peremptory challenges intelligently." *Baldwin*, 607 F.2d at 1297. This reasoning applies to the instant case. The trial judge's refusal to ask or permit to be asked of the prospective jurors any questions concerning knowledge of any of the government's witnesses, as requested by counsel, was error.

The government contends, however, that reversal is not required and suggests that we remand for a hearing to determine whether any of the jurors were, in fact, acquainted with any of the government's witnesses, citing *United States v. Studley*, 783 F.2d 934 (9th Cir.1986).

In *Studley*, the defendant challenged the district court's refusal to allow her, pursuant to 28 U.S.C. § 1867(f), to inspect records of the jury selection process. Although recognizing this refusal as error, the *Studley* court stated, following *Test v. United States*, 420 U.S. 28, 95 S.Ct. 749, 42 L.Ed.2d 786 (1975), that "[w]here a motion to inspect is erroneously denied * * * reversal is not required. Instead, the case should be remanded to permit inspection. If inspection reveals grounds upon which to challenge the jury selection, a defendant may file a motion, such as for new trial, under [28 U.S.C.] § 1867(a). * * * The court shall then grant the § 1867(a) motion if it determines that the jury selection procedure was prejudicial." *Studley*, 783 F.2d at 938 (citations omitted).

*Studley* and *Test* are distinguishable from the case at bar. The error in those cases, denial of a motion to inspect jury records for prejudice, was curable by reviewing the records themselves to determine if prejudice existed. Where remand for review of records will reliably reveal any prejudice, the need for reversal is obviated. In contrast, a remand to question jurors more than two years after trial is less certain to expose potential prejudice. Memories fade and biases change over time. In addition, the reliability of the jurors' responses as to whether they were acquainted with the government witnesses may be compromised by their verdict; at this late date a juror might understandably be embarrassed to admit knowing a witness when that knowledge, though not then acknowledged, has now become crucial. The guarantee of an impartial jury is far too central to our concept of a fair trial for determination of whether a defendant has been prejudiced by a partial or biased jury to be dependent upon the vagaries of such a procedure.

Further, manifest difficulties appear in reconstituting a jury so long after trial. Whereas jury records such as those in *Studley* are easily obtained and reviewed, locating and recalling twelve jurors after

more than two years is more difficult. Moreover, if some jurors have moved, or cannot be reached or have died, reversal would be required in any case. These considerations, while pragmatic, distinguish this case from *Test* and *Studley*, and weigh heavily in our decision against remand. For these reasons, particularly because of the lapse of time, we follow the precedent of *Baldwin*, rather than *Test* and *Studley*, and hold that the error requires reversal.

## 2) DIMINISHED CAPACITY AND VOLUNTARY INTOXICATION INSTRUCTIONS

Washington's proposed jury instructions on diminished capacity and voluntary intoxication with respect to the specific intent crimes charged were rejected.

The district court must give an instruction regarding any legitimate theory of defense that is supported by the evidence, and a failure to do so is reversible error. *United States v. Polizzi*, 801 F.2d 1543, 1549 (9th Cir.1986). Further, a defendant is entitled to an instruction concerning his theory of the case if the theory is legally sound and evidence in the case makes it applicable, even if the evidence is weak, insufficient, inconsistent, or of doubtful credibility. *United States v. Doubleday*, 804 F.2d 1091, 1095 (9th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1628, 95 L.Ed.2d 201 (1987).

Washington seeks to support his claims of diminished capacity and voluntary intoxication on the following evidence: 1) his disheveled appearance; 2) his "lost" and "confused" appearance; 3) that there was an odor of alcohol on him after the shooting, his eyes were red and he had soiled his pants; and 4) that four empty beer bottles and a wine glass were found in the vehicle which he drove.

There is no testimony, from medical experts or otherwise, suggesting that Washington generally lacked the mental capacity to form specific intent. No one identified Washington as drinking or as appearing to be intoxicated before or at the time of the shootings. To the contrary, one officer testified that immediately after the shoot-

ings Washington was cooperative, responsive, and followed all of the officer's commands, apparently without difficulty. That officer testified that he smelled alcohol on Washington's person while patting him down, but did not state that he smelled any alcohol on Washington's breath. Finally, though Washington's actions before and during the episode suggest strong emotional disturbance, they do not demonstrate intoxication. Reviewing the court's rulings on the whole, we conclude that the evidence in the record simply does not support Washington's lack of intent and intoxication defenses, and the refusal to give the disputed instructions was correct.

## 3) MALICE AFORETHOUGHT INSTRUCTION

Defendant challenges as constitutional error under *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), a jury instruction reading: "Use of a weapon or other instrument in a way that causes death is evidence of malice aforethought." This instruction is taken verbatim from the *Manual of Model Jury Instructions for the Ninth Circuit,* § 8.11A (1985).

A jury instruction is constitutionally defective if it creates a mandatory presumption, either conclusive or rebuttable, which shifts from the prosecution the burden of proving beyond a reasonable doubt an essential element of a criminal offense. *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). In contrast, an instruction advising of a permissive inference as to an essential element does not violate due process unless "the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." *Francis v. Franklin*, 471 U.S. 307, 314–315, 105 S.Ct. 1965, 1971, 85 L.Ed.2d 344 (1985).

The instruction in the instant case involves only a permissive inference. Advising the jury that it may treat the use of a deadly weapon as evidence of malice aforethought is not the same as *requiring* it to presume or infer malice aforethought

from that evidence. It is clear that malice aforethought may be inferred from evidence of use of a deadly weapon. *United States v. Vallez,* 653 F.2d 403, 406 (9th Cir.), *cert. denied,* 454 U.S. 904, 102 S.Ct. 412, 70 L.Ed.2d 223 (1981).

■ Moreover, when we review the challenged instruction in the context of the instructions as a whole, *Francis,* 471 U.S. at 315, 105 S.Ct. at 1971, it is even more apparent from an accompanying instruction that the inference to be drawn is permissive:

> If it is shown that the defendant used a deadly weapon in the commission of a homicide, then you may find, from the use of such weapon, in the absence of explanatory or mitigating circumstances, the existence of the malice which is an essential element of the offense. You are not obliged to so find, however.

This instruction has been upheld against constitutional challenge. *Vallez,* 653 F.2d at 406. Taken as a whole, the instructions did not require the jury to infer malice aforethought from the use of a deadly weapon. The challenged instruction was not erroneous.

### 4) ASSAULT CHARGE INSTRUCTIONS

■ In reviewing jury instructions, one consideration is whether as a whole they were misleading or inadequate to guide the jury's determination. *United States v. Pazsint,* 703 F.2d 420, 424 (9th Cir.1983).

Washington was charged with assaulting Major Owens with a dangerous weapon in violation of 18 U.S.C. § 113(c), a crime requiring the specific intent to do bodily harm. The district court first correctly instructed the jury that intent to do bodily harm was an essential element of the offense. Immediately afterwards, however, it gave the jury another instruction which, in listing the elements of the offense, omitted any reference to this requisite intent. Thereafter, the district court compounded its error, first instructing the jury that the assault charged required proof of specific intent before Washington could be convicted, but later erroneously instructing the jury that the assault charged was not a specific intent crime. These erroneous instructions were given despite timely objection by the defense.

■ We have said that a conviction should not rest on ambiguous and equivocal jury instructions on a basic issue. *United States v. Bagby,* 451 F.2d 920, 927 (9th Cir.1971). Whether Washington intended to do Major Owens bodily harm is a basic issue, since he cannot properly be convicted of the crime charged absent such intent; and we find it difficult to imagine jury instructions which are more ambiguous and equivocal than these. The government invites us to uphold the assault conviction on the basis that the giving of these misleading and erroneous jury instructions constituted harmless error. *Cf. Rose v. Clark,* —— U.S. ——, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (conviction may be upheld despite jury instruction which unconstitutionally created presumption of malice, if this *Sandstrom* violation was harmless error). Assuming, without deciding, that application of the harmless error doctrine is appropriate in this context, we are unable to confidently conclude that, on the whole record, these seriously erroneous jury instructions were harmless beyond a reasonable doubt. *Id.* at 3105. Therefore, we reverse and remand the assault conviction.

### 5) PRESENTENCE REPORT

Since we reverse and remand for new trial on both the murder and assault convictions, we need not address Washington's claim that the district court failed to comply with Fed.R.Crim.P. 32(c)(3)(D) at sentencing.

REVERSED and REMANDED.

BOOCHEVER, Circuit Judge, concurring:

I believe there was sufficient evidence of intoxication to require giving the requested instructions on diminished capacity and voluntary intoxication. *See United States v. Polizzi,* 801 F.2d 1543, 1549 (9th Cir.1986).