Thurman **DICKEY**,
Petitioner–Appellant/Cross–Appellee,

v.

Samuel **LEWIS**, Director, Arizona Department of Corrections; Attorney General of the State of Arizona, Respondents–Appellees/Cross–Appellants.

Nos. 87–1930, 87–1961.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 16, 1987.

Decided Oct. 20, 1988.

D. Jesse Smith, Tucson, Ariz., for petitioner-appellant/cross-appellee.

Bruce M. Ferg, Asst. Atty. Gen., Tucson, Ariz., for respondents-appellees/cross-appellants.

Before GOODWIN, Chief Judge, CHOY and BEEZER, Circuit Judges.

BEEZER, Circuit Judge:

Thurman Dickey ("Dickey") appeals from the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus, following conviction on first degree murder charges in Arizona. The district court found that the state trial court's jury instruction permitted the jury to presume "intent to kill" from Dickey's use of a deadly weapon. The district court concluded that the error was constitutional but,

following *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), harmless. The district court found that the requisite intent had been proved "beyond a reasonable doubt". On appeal, Dickey argues that the tainted instruction should not be deemed harmless error. The State of Arizona ("State") argues on cross-appeal, that: 1) Dickey's failure to comply with state procedural requirements precludes federal review of his claim; 2) Dickey is not entitled to relief since he requested an instruction similar to the one challenged; 3) the instruction challenged is constitutional; and 4) even if the challenged instruction is unconstitutional, as a violation of *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), the error is harmless by application of *Rose*. We affirm.

### I

In 1977, an Arizona superior court jury convicted Dickey of first degree murder. The court subsequently sentenced him to twenty-five years imprisonment. The Arizona Supreme Court affirmed. *State v. Dickey*, 125 Ariz. 163, 608 P.2d 302 (1980).

The state trial court gave a lengthy instruction to the jury which contained the sentence "intent to kill may be presumed from use of a deadly weapon."

Subsequent to Dickey's trial, the United States Supreme Court decided *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). In *Sandstrom*, the Court held that the instruction that "the law presumes that a person intends the ordinary consequences of his voluntary acts" unconstitutionally relieved the state of its burden of proof on the element of intent. *See id.* at 513–14, 521–24, 99 S.Ct. at 2453–54, 2457–59.

Dickey filed a motion in state superior court for a new trial, asserting *Sandstrom* error in the above jury instruction.[1] On

August 29, 1985, that court denied the motion, stating that the jury instructions, taken as a whole, did "not shift the burden of proof to the defendant on the question of intent but merely explain[ed] a permissive inference concerning the intent instruction." Dickey petitioned for review to the Arizona Supreme Court. On June 11, 1986, the court denied the petition with only a limited explanation.[2]

On June 30, 1986, Dickey filed a petition for writ of habeas corpus in the United States District Court for the District of Arizona. On March 13, 1987, the district court entered an order stating: 1) the Arizona Supreme Court ruled on the merits of Dickey's petition, thus waiving a bar to federal habeas review; 2) the decision in *Sturgis v. Goldsmith*, 796 F.2d 1103 (9th Cir.1986), found unconstitutional an instruction identical to the one given in Dickey's trial; and 3) the instruction, although unconstitutional, constituted harmless error. The court dismissed Dickey's petition. Dickey timely appeals, and the State cross-appeals.

### II

The State argues on cross-appeal that Dickey's failure to comply with state procedural rules regarding post-conviction review precludes federal consideration of the merits of his claim. Principles of comity bar federal courts from reviewing allegations of constitutional deprivations that state courts have rejected on the basis of adequate state procedural grounds, unless the petitioner can show cause for and prejudice from the waiver. *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977).

Dickey's original petition to the state court for post-conviction relief did not allege *Sandstrom* error. In December, 1984, Dickey filed a second post-conviction petition, which for the first time raised the *Sandstrom* error issue. The State argued

---

1. The petition was actually Dickey's second request for post-conviction relief. The State argues that his failure to raise the *Sandstrom* issue in the first petition procedurally bars federal review of the claim. *See infra.*

2. The State opposed the motion in superior court on procedural grounds as well as on the merits. When Dickey petitioned the Arizona Supreme Court for review, the review file included the State's procedural opposition.

against this petition both on procedural grounds and on the merits. Under Ariz.R. Crim.P. § 32.10, any grounds for relief not raised in a post-conviction petition "will be presumed waived and may not be the basis for subsequent petition unless the court finds there was reasonable ground for omitting the matter in the original petition for hearing." Thus, the State argued, since the law was clear at the time of Dickey's first petition, the statute barred him from raising the issue in his second petition.[3]

■ On August 29, 1985, the superior court denied the petition on the merits, i.e., the court held that the instructions, taken as a whole, did not shift the burden of proof on the question of intent to kill. The court did not address the state's procedural argument. The Arizona Supreme Court denied Dickey's petition for review, without explanation.

■ The State contends that the *Wainwright* "cause and prejudice" standard should be applied when the State raises a procedural bar and argues on the merits, and that it is not clear on which basis the state court denied relief. We reject this contention. An ambiguous state court dismissal is presumed to be on the merits. *Turner v. Compoy,* 827 F.2d 526, 529 (9th Cir.1987). This presumption is appropriate under the circumstances of this case. "The most logical inference to be drawn from the Appellate Division's unexplained affirmance is that the court accepted not only the judgment but also the reasoning of the trial court." *County Court of Ulster County v. Allen,* 442 U.S. 140, 153, 99 S.Ct. 2213, 2222, 60 L.Ed.2d 777 (1979). Moreover, the statute itself speaks only in terms of a presumptive waiver and gives the trial court discretion (upon a finding of a "reasonable ground" for the omission) to hear the claim.

The *Wainwright* bar to federal habeas review is based upon "respect to the sovereignty of the States in our federal system."

*Ulster,* 442 U.S. at 154, 99 S.Ct. at 2223. "[I]f ... the state courts [do not] indicate that a federal constitutional claim is barred by some state procedural rule, a federal court implies no disrespect for the State by entertaining the claim." *Id.* (footnote omitted). We affirm the district court's conclusion that no state procedural bar precludes federal review.

### III

■ The State argues on cross-appeal that Dickey should be denied habeas relief since he requested and received a jury instruction similar to the contested instruction. We are not persuaded. Contrary to the State's assertion, the requested and challenged instructions are not "virtually identical." Dickey requested and received the following instruction: "If you determine that the defendant used a deadly weapon in the killing, you may find malice." The challenged instruction was "intent to kill may be presumed from use of a deadly weapon." From a legal standpoint, the phrase "may find" can be interpreted more permissively than the phrase "may be presumed." *See Sandstrom,* 442 U.S. at 528, 99 S.Ct. at 2461 (Burger, J., concurring). We refuse to conclude that Dickey's receipt of the requested instruction bars federal habeas review.

### IV

The State's third argument on cross-appeal is that the district court incorrectly concluded that the challenged instruction shifted the burden of proof in violation of *Sandstrom.*

The district court cited *Sturgis v. Goldsmith,* 796 F.2d 1103 (9th Cir.1986), for the proposition that the instruction used in Dickey's case was unconstitutional. Notably however, in *Sturgis,* we found a similar error harmless without analyzing its consti-

---

**3.** At the time of this initial petition, *Sandstrom* had already been decided. In addition, the Arizona Supreme Court had decided *State v. Mincey,* 130 Ariz. 389, 636 P.2d 637 (1981), *cert.* denied, 455 U.S. 1003, 102 S.Ct. 1638, 71 L.Ed.2d 871 (1982), which held *Sandstrom* error to be "fundamental," thus raisable on appeal despite an absence of objection at trial.

tutionality.[4] The *Sturgis* decision, therefore, is persuasive, but not controlling.

In *Sandstrom,* the trial court instructed the jury that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." 442 U.S. at 513, 99 S.Ct. at 2453. The Supreme Court held that, since a reasonable juror could have interpreted the presumption as conclusive or burden-shifting, the instruction unconstitutionally relieved the State of its burden of proof as to defendant's state of mind. *Id.* at 521–24, 99 S.Ct. at 2457–59. While some jurors may have interpreted the instruction as permissive, a reasonable juror might also have interpreted the instruction as mandatory. *Id.* at 519, 99 S.Ct. at 2456.

Subsequently we have held that, "[a] jury instruction is constitutionally defective if it creates a mandatory presumption, either conclusive or rebuttable, which shifts from the prosecution the burden of proving beyond a reasonable doubt an essential element of a criminal offense." *United States v. Washington,* 819 F.2d 221, 225 (9th Cir.1987).

"In contrast, an instruction advising of a permissive inference as to an essential element does not violate due process unless 'the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury.'" *Id.* (quoting *Francis v. Franklin,* 471 U.S. 307, 314–15, 105 S.Ct. 1965, 1971–72, 85 L.Ed.2d 344 (1985)).

Our decisions have upheld instructions phrased in more permissive language than that deemed unconstitutional in *Sandstrom. See Washington,* 819 F.2d at 225 ("Use of a weapon ... in a way that causes death is evidence of malice...."); *United States v. Johnson,* 735 F.2d 373, 374 (9th Cir.1984) ("may consider it reasonable to draw the inference") (emphasis omitted);

*United States v. Ross,* 626 F.2d 77, 79 (9th Cir.1980) (same).

The challenged instruction here falls between the one condemned in *Sandstrom* and those which allow a particular inference to be drawn.

The State argues that use of the word "may" before "presume" distinguishes this case from *Sandstrom* and allows, but does not require, the jury to reach a particular conclusion on the ultimate fact.

Despite the semantic appeal of the State's argument, we must conclude that the challenged instruction displays the same basic infirmity found in the instruction rendered unconstitutional by the *Sandstrom* court. A juror here might reasonably have interpreted the permissive language (i.e. "may") as mandatory and, consequently, could have impermissibly relied upon a presumption similar to the one condemned in *Sandstrom.*[5]

The Court in *Sandstrom* accepted the fact that some jurors could have interpreted the challenged instruction as permissive. 442 U.S. at 519, 99 S.Ct. at 2456. The first essential inquiry, however, is whether a "reasonable juror" *could* have viewed the presumption as conclusive or burden-shifting. *Id.* We conclude, as a threshold matter, that a reasonable juror could have interpreted "you may presume" in a burden-shifting manner.

Our conclusion that the challenged instruction impermissibly shifts the State's burden does not, however, conclude our inquiry into the constitutionality of the challenged instruction.

Rather, we are next required to review the constitutionality of this particular instruction in context of the instructions *as a whole. Francis,* 471 U.S. at 315, 105 S.Ct. at 1971; *Cupp v. Naughten,* 414 U.S. 141,

---

4. In *Sturgis,* the defendant challenged the precise instruction at issue here, i.e., "[i]ntent to kill may be presumed from use of a deadly weapon." Citing *Sandstrom,* we stated: "This contention states a colorable claim for habeas relief under the due process clause." 796 F.2d at 1107. The court upheld the district court's conclusion that the error was "harmless beyond a reasonable doubt." *Id.*

5. By way of example, Dickey notes that if the judge instructed the jury that it *"may* now retire to deliberate on its verdict," few jurors would believe they had the option of watching a ball game or going to a bar instead.

146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973), *Washington,* 819 F.2d at 226.

In addition to the challenged instruction, the jury was told *inter alia* that: 1) the State must prove every part of the charge beyond a reasonable doubt; 2) the law does not require a defendant to prove his innocence or to produce any evidence; and 3) the burden of proving guilt beyond a reasonable doubt never shifts throughout the trial. The State argues that no "reasonable juror" could have perceived the *entire* charge as mandatory or burden-shifting.

The *Sandstrom* Court, however, rejected a similar argument, noting that "[t]he jury could have interpreted the two sets of instructions as indicating that the presumption was a means by which proof beyond a reasonable doubt as to intent could be satisfied." 442 U.S. at 519 n. 7, 99 S.Ct. at 2456 n. 7. Moreover, our prior decisions upholding a challenged instruction, after review of the entire charge, have focused on instructions which directly qualify the instruction at issue here. *See Washington,* 819 F.2d at 226 (challenged instruction followed by statement that "[y]ou are not obliged to so find, however"); *Johnson,* 735 F.2d at 374 (challenged instruction followed by statement that "it is entirely up to you to decide what the facts are from the evidence in the case"); *Ross,* 626 F.2d at 79 (challenged instruction followed by statement that "it is entirely up to you to decide what facts to find from the evidence"). By contrast, in this case, the trial court failed to immediately qualify the challenged instruction. Thus, we cannot conclude, with any certainty, that the trial court reduced the impact of the potentially burden-shifting instruction.

We must conclude that a reasonable juror could have interpreted the instruction as satisfying the State's burden of proof with respect to Dickey's intent to kill. Thus, we agree with the district court's conclusion that the instruction was a violation of *Sandstrom*—that is, it was unconstitutional.

## V

We must now inquire whether the unconstitutional *Sandstrom* instruction could

have affected the verdict or was, rather, harmless error under the Supreme Court's reasoning in *Rose,* 478 U.S. at 580–82, 106 S.Ct. at 3107–09.

Dickey asserts that the district court incorrectly concluded that the *Sandstrom* violation was merely harmless error. The district court's determination that the unconstitutional instruction was harmless is a mixed question of law and fact. We review this question *de novo. Herd v. Kincheloe,* 800 F.2d 1526, 1528 (9th Cir.1986). Once a defendant has established *Sandstrom* error, the burden is on the State to establish that the error was harmless. *See Scarborough v. Arizona,* 531 F.2d 959, 962 (9th Cir.1976).

### A

■ In *Rose v. Clark,* 478 U.S. at 579–82, 106 S.Ct. at 3106–09, the Court held that harmless error analysis applies to *Sandstrom* violations. The Court said that "[t]he question is whether, 'on the whole record ... the error ... [is] harmless beyond a reasonable doubt.'" *Id.* at 583, 106 S.Ct. at 3109 (quoting *United States v. Hasting,* 461 U.S. 499, 510, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983)).

In *Rose,* the jury was instructed that "[a]ll homicides are presumed to be malicious in the absence of evidence which would rebut the implied presumption." *Id.* at 574, 106 S.Ct. at 3104. That instruction shifted the burden of proof on the element of intent, violating *Sandstrom. Id.* 478 U.S. at 579–80, 106 S.Ct. at 3106–07; *see also Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985).

The Court concluded however that this constitutional error was harmless since, "[i]n many cases, the predicate facts conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not *intend* to cause [the] injury." *Rose,* 478 U.S. at 580–81, 106 S.Ct. at 3107–08. "[I]t is enough to recognize that in some cases that inference [of requisite intent] is overpowering." *Id.* at 581, 106 S.Ct. at 3108.

The Court recently rephrased the relevant inquiry, asking whether "the facts found by the jury were such that it is clear beyond a reasonable doubt that if the jury had never heard the impermissible instruction its verdict would have been the same." *Pope v. Illinois,* 481 U.S. 497, 107 S.Ct. 1918, 1922 n. 6, 95 L.Ed.2d 439 (1987).

In *Pope,* the Supreme Court, quoting *Rose,* concluded that "a conviction should be affirmed 'where a reviewing court can find that the record developed at trial established guilt beyond a reasonable doubt....'" *Id.* at 1922 (quoting *Rose,* 478 U.S. at 579, 106 S.Ct. at 3107).

In the instant case, although proper instructions on intent to kill and the presumption of innocence accompanied the erroneous *Sandstrom* instruction,[6] the instruction ("intent to kill may be presumed from use of a deadly weapon") is clearly unconstitutional.

In our view, however, the "predicate facts" do establish beyond a reasonable doubt that Dickey intended to kill his victim when he shot the victim, Karl Koester, in the chest at point-blank range, and then blocked all attempts to render assistance to the victim. Moreover, the jury could not have arrived at its verdict without also determining, independently of *Sandstrom* error, that the act was premeditated and that the appellant's self-defense claim was without merit. In view of "overpowering" evidence of intent to kill, we conclude that the *Sandstrom* error was, in this instance, harmless.

The operative facts are as follows. Karl Koester, the victim, erroneously drove onto the perimeter of Dickey's property. Koester immediately withdrew to a public road, upon discovering that a vehicle on Dickey's property, initially thought to belong to a friend of Koester's, was not the friend's vehicle.

Dickey's wife, on seeing Koester's vehicle, contacted Dickey by CB radio and informed him of the trespass, but affirmed to Dickey that she was "all right" and that "[t]he van is leaving the property."

Dickey came into view of his property within seconds and observed Koester's vehicle coming "onto the main road." He immediately "chased" or "gave chase" to Koester's vehicle. Dickey, according to a passenger in Dickey's vehicle (Johnson), was "doing around 100 m.p.h." with the intent "to catch the van" carrying Koester.

Koester attempted to evade Dickey before and after a gunshot was fired from Dickey's vehicle (allegedly by Johnson, who was subsequently convicted of assault with a deadly weapon for the act). Initially, Koester attempted to outdistance Dickey's vehicle. Dickey pursued Koester, first in one direction, then in the reverse direction. The first shot, fired at or near Koester's vehicle, was discharged when Koester's vehicle stopped.[7] That shot did not hit Koester or the vehicle. Thereafter, Koester at-

---

6. The jury was charged with proper instructions on intent to kill and presumption of innocence in combination with offending *Sandstrom* instruction. The proper instructions included:

*Intent*

The state must prove that the defendant has done an act which is forbidden by law and that he intended to do it. You may determine that the defendant intended to do the act if he did it voluntarily. The state does not have to prove that the defendant knew the act was forbidden by law.

In the crime of murder or voluntary manslaughter, a necessary fact to be proved is the existence in the mind of the defendant of the specific intent to kill a fellow-human being, and unless such intent to kill a fellow-human being so exists, that crime if not committed. V. 1, Instr. 12.

A defendant in a criminal case is presumed by law to be innocent. The law does not require a defendant to prove his innocence or to produce any evidence.

The burden of providing the defendant guilty beyond a reasonable doubt rests upon the state. This never shifts throughout the trial. The state must prove every element of the crime beyond a reasonable doubt before you may return a verdict of guilty.

The term "reasonable doubt" means doubt based upon reason. This does not mean an imaginary or possible doubt. It is a doubt which may arise in your minds after a careful and impartial consideration of all the evidence or from the lack of evidence. V. 1, Instr. 9.

7. Johnson testified Dickey told him to fire this shot, and that he did so. Dickey testified, "I heard a shot and looked over and he had his arm out the window."

tempted to hide from and outdistance Dickey.

Eventually, Koester's vehicle came to rest facing the left front of Dickey's vehicle. Exactly how this happened was disputed. Johnson testified that, while he and Dickey were "increasing speed" in pursuit, Koester "made a U-turn in front of us," then "pulled up along side of us and stopped." Later Johnson revised his account, saying "[Koester was] coasting [beside us]." Directing himself to the unlikelihood of a U-turn at high speed in the close chase, Johnson testified, "I wondered how [Koester] stayed up on his wheels when [he] turned."

Alternatively, Norman (one of Koester's passengers) indicated that Dickey's vehicle had passed Koester's vehicle, as both vehicles headed *toward* a nearby town and Dickey then returned to block Koester's vehicle. Police Officer Flake testified that Koester's vehicle came to rest pointing *toward* the town and that Dickey's vehicle was facing *away from* the town, corroborating Norman's account and conflicting with Johnson's.

As Johnson corroborated and Dickey admitted, Dickey took a loaded .410 shotgun-pistol "off the dash" and set it at "[his] side" before or during the "chase."

Officer Flake testified that a .410 shotgun-pistol was taken from Dickey after the shooting, and that it "was [at that time] sitting on the seat of [Dickey's vehicle]."

Johnson testified that Dickey told him to remove a loaded .357 magnum pistol from the glove compartment during the chase and that Dickey had, within the passenger compartment, a .22 automatic pistol.[8]

Officer Peterson testified that the ".410 shotgun-pistol," which "could be used . . . as a .45 pistol," was immediately taken from Dickey after police arrived.

Officer Romo testified that an "expended .410 shell" was found in the .410 shotgun-pistol; this weapon is also known as a "Thompson center arms weapon."[9]

Officer Romo testified that "four unexpended .357 magnum shells and one empty [round]" were extracted from the .357 magnum "revolver," and six other live rounds from Dickey's automatic ".22 caliber revolver." Live .410 shotgun shells were also taken from Dickey's pockets. Boxes of .410, .357 magnum, and .22 ammunition were removed "from the dash" and "from the glove compartment" of Dickey's vehicle.

Koester was killed with a .410 shotgun shell fired from the .410 shotgun-pistol seized from Dickey. Dickey admits that he did "shoot and kill" Koester.

Asked *why* he was carrying three loaded firearms, one in the seat at "[his] side" as he "chased" Koester, Dickey testified that he was "hunting rabbits."[10]

Asked by the prosecutor whether he was hunting rabbits *at night* and *on the road*, Dickey responded: "Not necessarily, not necessarily."

Dickey was asked to explain the purpose to which he ordinarily put each of his weapons. Asked about the purpose to which he put the automatic .22 pistol, he responded: "[I use it] to hunt rabbits. . . ." Asked about the purpose to which he put the .410 shotgun, Dickey did not describe it as a weapon he used to hunt rabbits, but rather as the firearm he used to "shoot birds."

An acquaintance testified that several weeks prior to the shooting, Dickey had related to the acquaintance that he would not need assistance if someone caused "trouble" for him near his home, since "I always carry a bit [a firearm] in my truck" and "[i]f anybody ever messes with me, I'll blow them away."

8.  The .22 pistol was loaded at the time of the shooting.

9.  Officer Flake testified, however, that the defendant's .410 pistol was "an unusual weapon" and that the officer had "never seen [a pistol that would shoot a shotgun shell] before."

10.  Dickey stated: "[A]t that time, that night, that is the prime time for hunting rabbits, and I figured if we would have seen a rabbit or so, that I could shoot a rabbit."

Dickey testified in his own defense. He explained the killing in the following terms:

"Q: [W]hat happened [after the two vehicles had stopped]....?

A: Well, the driver immediately jumped out.

Q: What did he do?

A: Well, he came towards the vehicle and he hollared 'I'll kill you, you s.o.b.' and I seen a gun in his hand and he jerked open the door and then I seen the look on his face and I knew he was going to kill me, so I fired, I got the gun and fired.

Q: The gun was in the seat beside you?

A: Yes, sir, it was.

\*    \*    \*    \*    \*    \*

Q: And did you observe what happened to the driver of the van [Koester]?

A: Yes, for a second he just stood there and he said 'I'll kill you, I'll kill you,' and then he started staggering toward the back of the pickup trying to hold onto the pickup and he fell behind the pickup...."

Dickey's account of these few seconds is at variance with the accounts of each of the other witnesses in material ways. First, no fingerprints belonging to Koester were ever found on the door of Dickey's pickup truck or, specifically, on the vehicle's door handle. Second, not one of Koester's passengers either heard or saw Dickey's door open before or after the shooting, despite Dickey's assertion that Koester had "jerked open the door." [11] All evidence indicates that Dickey's window was down at the time of the shooting. Third, defense counsel termed one of Koester's hands a "metal hand" (which might presumptively

support Dickey's self-defense claim); the hand, however, was wooden.

Koester's passengers, Norman and Greenwood, as well as Dickey's passenger, Johnson, each related a detailed version of the shooting which conflicts with the account given by Dickey. On significant facts, these accounts corroborate one another.

Norman and Greenwood testified that Koester was *not* angry upon climbing out of his vehicle and approaching Dickey's vehicle. Rather, Norman testified that Koester was "confused, kind of bewildered. We did not know what was going on." Greenwood testified that, "[Koester] just wanted to find out what was going on." Both eyewitnesses were within feet of Koester when he was shot, yet neither eyewitness heard Koester issue a threat to Dickey. Moreover, neither eyewitness heard Dickey warn or otherwise speak to Koester. Even Johnson, Dickey's passenger and witness, admits that he did not hear Dickey warn or otherwise speak to Koester before killing him. Both eyewitnesses testified that the time which elapsed between Koester's leaving his vehicle and the shooting was no more than a few seconds. [12]

Norman then testified that, "[Dickey said] 'Get the 357' right after he shot [Koester]. Right before I ran." [13]

Norman and Greenwood testified that Dickey held them at gunpoint for approximately half-an-hour. Both testified that Dickey would not permit *either* witness to check Koester's lifesigns or to render assistance to Koester. [14] Johnson, the third

---

**11.** Norman testified that he looked at the door *three* times in the moments after the shooting and that the door was, each time, shut. Johnson, Dickey's witness and passenger, testified only that he saw the door open *after* the shot.

**12.** Norman testified that:

We [Koester and Norman] both got out at the same time, and I was about halfway out, and he was all the way out; he shut his door and then I heard a shot right after that, and that's when I stopped, I was nearly all the way out .... my door wasn't closed yet and I was looking .... over when I heard the shot. I looked over....

**13.** Johnson testified that defendant had asked him to remove a loaded .357 magnum pistol from the glove compartment shortly before the killing.

**14.** Greenwood testified that Dickey refused aid or comfort to Koester and refused to permit any one to check on the extent of Koester's injuries.

"Q: What else did [Dickey] say [after shooting the victim]?
A: Well, I asked him if he could do anything for [Koester] and he said, 'Well, Miss, there is not a damned thing anybody can do for Karl [Koester] [b]ecause I blew the hell out of him.'

eyewitness, corroborated the testimony of Norman and Greenwood on this point. Dickey conceded at trial that he did not attempt to check Koester's lifesigns or to administer any aid to Koester after shooting him.

Both Norman and Greenwood testified that Dickey consistently exhibited no emotion or sense of remorse after the shooting. Greenwood testified: "[Dickey acted] [l]ike he didn't care, [l]ike he just did the world a big favor or something." * * * "[Dickey] just acted like he didn't care, like he didn't do anything wrong." Norman added: "[Dickey] didn't act afraid, or he didn't show any remorse or anything about the whole situation. He didn't care what happened." * * * "[Dickey] had no concern for the person he had just shot. He just sat in his vehicle and let the guy die."

A visible absence of emotion on Dickey's part was also observed by the first police officers at the scene.[15]

Despite lengthy interviews on the night of the shooting, no officer could recall either Dickey or his passenger stating that

Dickey had been threatened, verbally or otherwise, by Koester.[16]

Other than the three firearms recovered from Dickey, no firearm or weapon was recovered, either from Koester or from the scene of the killing.

Johnson did testify that the victim made a statement to Dickey, but Johnson could not "exactly" identify what the statement made was. On cross-examination, Johnson was asked: "Do you recall telling [the Deputy Sheriff and prosecutor, at an earlier date] ... that you didn't know at all what was said [by Koester to Dickey], that he said something? Johnson responded: "That's right ... That's true." Johnson then gave the following testimony:

Q: Isn't it true, Mr. Johnson, that Mr. Dickey, before firing the shot, did not say, 'Don't come any closer,' or anything else to Mr. Koester [the victim] before he shot him dead?

A: No, sir, he never said anything.

Q: Didn't say a word?

A: No, sir.

---

Q: Where was Karl [Koester] [at this time]....?
A: He was lying on the ground behind the truck almost.
Q: Could you tell whether or not he was hurt?
A: Yes.
Q: How could you tell?
A: Because there was blood running down the road."

**15.** Officer Flake testified as follows:
"Q: Were you the first officers on the scene?
A: Yes, we [Officers Flake and Peterson] were.

Q: Tell us how [Dickey] was acting.
A: [Dickey] was calm. I didn't see any sign of fear....
Q: Officer, could you tell us whether or not [Dickey] showed any emotion over having shot and killed a person.
A: No, he showed no emotion."
Officer Peterson corroborated Officer Flake's testimony:
"The Court: You may state what emotion or displayed emotion if any that you observed.
The Witness: Well, the way it appeared to me, he was as calm as a skunk and very unemotional."

**16.** Officer Flake testified:

"Q: Tell us [about your conversation with Dickey upon arriving at the scene of the shooting]....
A: [H]e said that he gave chase to this vehicle and had stopped them and then when [Koester] got out of the vehicle, said, 'I didn't know what he was going to do, so I shot him'....

Q: [D]id [Dickey] ever tell you that he had been threatened?
A: He didn't.
Q: That night at any time did he tell you that he had been threatened?
A: No."
Officer Peterson corroborated Officer Flake's testimony:
"Q: [W]hile you were there that evening talking to [Dickey], did he at any time indicate to you that [Koester] had threatened to kill him?
A: No, not that I recall.
Q: You were there the whole evening during the investigation?
A: Right."
Greenwood corroborated both officers' testimony:
"Q: [D]id [Dickey] ever say ... that [Koester] threatened him in any way?
A: No.
Q: He just said he didn't know what [Koester] was going to do, is that all he said....?
A: Yes."

Q: Didn't warn him at all?

A: No, sir.

Q: Didn't fire a shot over his head?

A: No, sir.

Q: Didn't fire a shot into the dirt?

A: No.

Q: He shot him right in the chest?

A: Yes.

Q: With a shotgun?

A: Yes, sir.

\* \* \* \* \* \*

Q: [I]sn't it true that after Mr. Koester was shot, he staggered to the back ... behind the pickup and fell in the roadway?

A: Yes.

Q: And isn't it true that [Dickey] remained in the pickup and did not go back and check him at all?

A: No, he did not.

Q: And he didn't ask you to go back and he didn't ask anybody else to go back and check him, did he?

A: No.

\* \* \* \* \* \*

Q: Isn't it true, Mr. Johnson, that you were surprised and even startled when Mr. Koester was killed?

A: Yes, I was.

Q: [R]ight up to the very time when the shot [which killed the victim] was fired, you didn't expect it, isn't that right?

A: No, I didn't expect it.

Q: Isn't it fair to say, Mr. Johnson, that you were somewhat stunned when the man was killed in the situation as it appeared that night?

\* \* \* \* \* \*

A: Yes, I was surprised. You know, people just don't go shooting each other...."

Dickey's credibility was substantially undermined during cross-examination.[17]

While the jury's rejection of Dickey's self-defense claim is not sufficient to establish "intent to kill," the jury's rejection of self-defense necessarily removes the justification offered by Dickey for knowingly shooting and killing Koester.

Having established the unjustified act of killing, the prosecution must then establish "intent to kill" by providing evidence which would lead a rational jury to conclude that "the defendant [could not have] committed the relevant act [without] ... intend[ing] to cause" the result. *Rose*, 478 U.S. 580–81, 106 S.Ct. at 3107–08 (emphasis omitted).

The State has carried that burden. The State provided strong evidence that Dickey intended to "chase" and to "catch" Koester; that Dickey was carrying three loaded, easily accessible, and powerful firearms in his vehicle at the time of the murder; that Dickey placed one of three loaded firearms on the seat at "[his] side" before or during "giving chase" to Koester; that Dickey was carrying live ammunition, not only in the chambers of the three firearms and on "the dash[board]" of his vehicle during the chase, but also in his pockets at the time of the shooting; that Dickey instructed his passenger to remove a loaded .357 magnum pistol from the glove compartment *during*

---

**17.** The following contradictions illustrate the degree to which Dickey's credibility was undermined by his own testimony.

Dickey testified that after the shooting, Norman had "said that ... he would kill my wife and my kids." Subsequent testimony, however, indicated that Dickey had never mentioned his wife or his children to Norman.

Dickey testified that he made "continual" efforts to contact law enforcement throughout his chase of Koester. Yet, police officers and the only witness who was monitoring CB radio during the chase received no such calls prior to the one call in which Dickey stated he had "one down and three in custody."

Dickey testified that he passed no other vehicle the night of the chase. Yet, one witness driving the distance between Dickey's house and the nearby town on the night of the chase testified that he had been required to "move[ ] over" as he was passed by Dickey (whom he recognized), since Dickey "came upon [the witness] fairly fast" and was "hugging the center of the road."

Dickey testified that he was on the scene, after the police arrived, for only "ten minutes." Officer Flake testified that Dickey spoke to police officers on the scene for "over two hours."

Dickey testified that the reason he "gave chase" to Koester's vehicle was that there had been "considerable incidents" of law breaking on his property and that "tools [had been] stolen" on previous occasions. However, Dickey conceded that he had never reported any theft.

the chase; that Dickey directed this passenger to fire a shot from the vehicle; [18] and that Dickey repeatedly reversed direction during the chase until he had stopped Koester's vehicle. The State provided overwhelming evidence, and Dickey conceded, that he shot and killed Koester with the .410 shotgun-pistol. The State provided overwhelming evidence that Dickey never warned Koester, verbally or otherwise, before shooting him in the chest (at point-blank range); that Dickey held Koester's passengers at gunpoint after the shooting, blocking all attempts to check Koester's lifesigns and to render assistance; and finally, that Dickey demonstrated "no emotion" and "no remorse" after having killed Koester. Dickey conceded that he neither checked on nor rendered assistance to his victim. Contradictions diminished Dickey's credibility on the material and collateral facts before, during, and after his killing, strengthening the testimony of the cross-corroborating State witnesses.

On the basis of the "predicate facts," we conclude that a rational juror would not have been required to rely on the erroneous *Sandstrom* instruction where finding Dickey intended to kill Karl Koester. "[T]he predicate facts conclusively establish intent, so that no rational jury could find [after rejecting defendant's self-defense justification] that the defendant committed the relevant act but did not *intend* to cause [the] injury." *Rose*, 478 U.S. at 580–81, 106 S.Ct. at 3107–08.

Accordingly, we conclude, in this case, that the *Sandstrom* error was harmless beyond reasonable doubt. Since a conviction will be affirmed "where a reviewing court can find that the record developed at trial established guilt beyond a reasonable doubt....", *Pope*, 107 S.Ct. at 1922 (quoting *Rose*, 478 U.S. at 579, 106 S.Ct. at 3107), we affirm.

AFFIRMED.

18. Despite Dickey's denials, his passenger and witness did not possess any obvious motive not to be truthful on this point at Dickey's trial, since the passenger had already been convicted of assault with a deadly weapon for the incident.